**Jose M. Gonzalez, Pro Se**
1215 Hidalgo Street #205
Laredo, TX 78040
(956) 608-1811
middlemanadvert@gmail.com

**FILED**

January 24, 2025

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

UNITED STATES DISTRICT COURT
**WESTERN DISTRICT TEXAS
AUSTIN DIVISION**

BY: _Christian Rodriguez_
DEPUTY

**JOSE M. GONZALEZ,**

            Plaintiff,

vs.

**INTERNATIONAL MEDICAL DEVICES, INC., MENOVA INTERNATIONAL, INC., JAMES J. ELIST M. D., A MEDICAL CORPORATION, AND DR. JAMES ELIST,**

            Defendants.

Case No.: **1:24-cv-00982-DAE:**

**AMENDED CIVIL COMPLAINT**

Plaintiff Jose M. Gonzalez files this Complaint against Defendants International Medical Devices, Inc. ("IMD"), Menova International, Inc. ("Menova"), James J. Elist, M.D., a Medical Corporation, and Dr. James Elist and in support of his claims alleges as follows.

**INTRODUCTION**

Defendants have jointly developed and marketed the "Penuma" device, a silicone penile implant, as a penis enlargement device. Since at least January 2017, Defendants have engaged in a systematic, coordinated campaign to market Penuma for cosmetic penis enlargement. Their websites and advertisements target men who have healthy, normal bodies but simply want larger penises.

Dr. James J. Elist has also developed a surgical procedure for implanting the device. He has performed thousands of these procedures, handling patient consultations at his clinic in Beverly Hills and performing penile implant surgeries in his operating room at the Beverly Hills

AMENDED CIVIL COMPLAINT - 1

South Pacific Surgery Center. Defendants falsely and misleadingly tout the device and procedure as "FDA-cleared," giving reasonable consumers the false impression that the U.S. Food and Drug Administration ("FDA") has determined that Penuma is safe and effective for cosmetic penis enlargement procedures in men with healthy, normal bodies.

Unbeknownst to the men who undergo these procedures, however, Penuma is not safe and effective—nor is it FDA-cleared—for cosmetic penile enlargement. Instead, Penuma is FDA cleared only "***for use in the cosmetic correction of soft tissue deformities.***" Worse, implantation of the Penuma device not only does not usually result in any lengthening of the penis, but it also frequently causes scarring, resulting in the penis becoming shorter. In addition, contrary to Defendants' misrepresentations that the procedure is "permanent" and "reversible," the procedure frequently leads to infections and complications that require removal of the device, which, in turn, causes permanent damage to the penis. Defendants knew these facts at least by 2015, but nevertheless continued to market Penuma as "the first FDA-cleared penile implant for cosmetic enhancement" and to urge consumers with healthy, normal penises to purchase the Penuma device and procedure to "enhance and enlarge the length, girth, and size of your penis."

Defendants profited substantially from these misrepresentations, selling the Penuma device and procedure to thousands of men at a cost of $15,000–$20,000 each. Plaintiff accordingly brings this action to recover damages and restitution while enjoining Defendants from continued to false advertisement and marketing of Penuma as a safe and effective FDA-cleared procedure for cosmetic enhancement of penis size in men with healthy penises.

## **PARTIES**

Plaintiff **Jose M. Gonzalez** is a resident of Webb County, Texas.

Defendant **International Medical Devices, Inc**. ("IMD") is a California corporation located at 717 N. Maple Drive, Beverly Hills, CA 90210, in Los Angeles County.

Defendant **Menova International, Inc**., ("Menova") is a California corporation located at 8500 Wilshire Blvd., Suite 707, Beverly Hills, CA 90211, in Los Angeles County.

Defendant **James J. Elist, M.D**., a Medical Corporation, is a California corporation headquartered at 8500 Wilshire Blvd., Suite 707, Beverly Hills, CA 90211.

Defendant **Dr. James Elist** is an individual residing at 8500 Wilshire Blvd., Suite 707, Beverly Hills, CA 90211.

## JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1330 et seq. Plaintiff Jose M. Gonzalez is a resident of Webb County, Texas, and is subject to general personal jurisdiction in Texas.

The court has diversity jurisdiction based on the differing state citizenship of the parties. Specifically, the Plaintiff is a Texas resident. Defendant Dr. Elist is a California resident. IMD, Menova, James J. Elist, M.D., a Medical Corporation, and Dr. Elist are incorporated in California and maintain their principal places of business in California.

The Court also has specific personal jurisdiction over all Defendants because they intentionally directed their activities into Texas and caused injuries in Travis County, Texas, satisfying the diversity requirement under 28 U.S.C. § 1332(a)(1). As such, venue is proper in this district under 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Bexar County, Texas.

In addition, venue is also proper in this district pursuant to 28 U.S.C. § 1391(a).

Defendants are deemed to reside in this district because their contacts with this district would be sufficient to subject them to personal jurisdiction if this district were a separate state. The defendant's medical device was shipped across state lines from California into Travis County, Texas, where it was implanted in the plaintiff. This interstate shipment and implantation further substantiate the federal jurisdiction as it involves interstate commerce and the application of federal laws governing such transactions.

Finally, the United States District Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1), which grants federal courts jurisdiction over civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states. Furthermore, the amount in controversy exceeds the statutory threshold of $75,000, as evidenced by the plaintiff's claims for damages. Therefore, this Court has proper jurisdiction to hear and adjudicate this dispute under the doctrine of diversity jurisdiction, ensuring a fair and impartial forum for both parties.

## JOINT ENTERPRISE LIABILITY

Defendants shared a common plan or design for illegally marketing the Penuma device and procedure for cosmetic enlargement of normal penises.

Each Defendant had knowledge of and agreed to market Penuma for the cosmetic enlargement of normal penises.

Defendants acted as a joint enterprise with regard to all of the actions alleged in this Complaint.

Whenever this Complaint refers to any act of Defendants, the allegations refer to each of the Defendants, acting individually, and also to all of the Defendants acting jointly.

All acts of each of the Defendants were ratified and adopted by each of their Co Defendants.

## STATEMENT OF FACTS

Before undergoing the Penuma implantation procedure, Plaintiff Jose M. Gonzalez had a normal, healthy penis. He had no soft tissue deformity of the penis, nor any urological problems of any kind. While browsing the Internet, Mr. Gonzalez saw advertisements for the Penuma device and procedure, including a website of the inventor of the Penuma; Defendant Dr. James J. Elist.

Mr. Gonzalez saw these advertisements at his home in Webb County, Texas where Defendants had directed them in order to induce Webb County residents like Mr. Gonzalez to purchase the Penuma device and undergo the implant procedure.

Having read Defendants' advertisements, Mr. Gonzalez reasonably believed that the Penuma device was safe and effective for men like him who had normal penises, but simply wanted their penises to be larger. He further reasonably believed, based on the misrepresentations in Defendants' advertisements, that the Penuma device had been approved by the FDA for such purpose, and this belief gave him a sense of comfort that the device was safe and effective. Had Mr. Gonzalez known that Penuma had not in fact been approved or cleared by the FDA for cosmetic penile enlargement in men with normal penises and/or that it was not safe and effective for men with normal, healthy penises, he would not have purchased the Penuma device or procedure.

Mr. Gonzalez also reasonably believed, based on misrepresentations in Defendants' advertisements, that the Penuma procedure was not permanent and completely reversible and that there would be no adverse consequences from removal of the device. Had Mr. Gonzalez known

that the Penuma implantation procedure was permanent and could not be reversed without causing permanent damage to the penis, he would not have purchased the Penuma device or procedure.

Mr. Gonzalez also reasonably believed, based on misrepresentations in Defendants' advertisements, that the Penuma procedure would result in a natural looking penis. Had Mr. Gonzalez known that the Penuma procedure often results in abnormal and deformed-looking penises, he would not have purchased the Penuma device or procedure.

On May 19, 2022, Mr. Gonzalez met with a board-certified urologist with Urology Austin, PLLC named Dr. Bryan Kansas. Dr. Kansas website touts that he has "*implanted over 1,200 penile prostheses since the beginning of his medical practice.*"

During this consultation with Dr. Kansas, Mr. Gonzalez filled out a questionnaire and watched a video. Mr. Gonzalez was also informed that the implantation of the Penuma was "a simple and reversible procedure." At no point did Dr. Kansas inform Mr. Gonzalez that Penuma was not safe and effective or not FDA cleared for cosmetic enlargement of normal penises.

On July 26, 2022, after listening to Dr. Kansas, the Penuma, and Dr. Elist's website taut the thousands of positive outcomes, Mr. Gonzalez underwent implantation of the Penuma.

To perform the procedure, Mr. Gonzalez paid $16,000 to Dr. Kansas for the device, surgery, and three post operative care visits. During the first of these post-op visits, Mr. Gonzalez was informed that some swelling may occur and that it was normal. Additionally, a compression sock may be used to aid in any potential, fluid build-up.

Indeed, before the 8-week evaluation arrived, Mr. Gonzalez had already experienced both the swelling and fluid build-up. At the evaluation, Mr. Gonzalez complained of discomfort in the groin area and noted deformities in the position of the implant. Specifically, that the implant

failed to elongate and remained "bunched" around the base of his penis resulting in a "cone-like" shape. In addition, Mr. Gonzalez suffered complications from the surgery, including abdominal pain, sharp groin pain, and capsule (scarring).

On October 17, 2022, Dr. Kansas examined Mr. Gonzalez and noted that that the patient had "*began experiencing retraction, flaring with a thick base*." Additionally, Dr. Kansas opined that the cause of that flaring was from the base of the implant opening up from the retraction that had occurred.

Continuing the examination, Dr. Kansas informed Mr. Gonzalez that an additional device would need to be purchased to elongate the penis. Mr. Gonzalez then purchased the $500.00 device. However, after one year of usage the device failed to correct the abnormality. In the interim, Mr. Gonzalez continued to experience pain and discomfort in the groin area.

In subsequent emails, Dr. Kansas memorialized his opinion that the older model of Penuma was defective and that a newer version, released in April 2023, would correct Mr. Gonzalez issues. Ostensibly, the newer model, branded the *Himplant*, was designed to correct these known flaws by the Defendants' previous—failed product.

In fact, Dr. Kansas, citing the number of dissatisfied Penuma patients, has since retired from the field leaving Mr. Gonzalez without continued after-care.

Accordingly, Mr. Gonzalez then searched for a reconstructive urological surgeon to remove the Penuma device. That search led him to meet with Dr. Kambiz Tajkarimi (*trained by Defendant Dr. Elist)* at UROLOGY SURGICAL CONSULTING, PC; Leesburg, Virginia, who opines that Mr. Gonzalez will need to have the failed Penuma removed and replaced with a newer model. However, as a consequence of the Penuma's position, this entails the cutting of ligaments to stretch out the penis. Additionally, due to the previous failed implant, there is no guarantee

that Mr. Gonzalez will fully regain even his original length, girth, and sensitivity. According to Dr. Tajkarimi's website, he charges a minimum of $17,000.00 for implant surgery.

Therefore, as Dr. Kansas no longer practices in this field, he has no ability to continue the necessary care for Mr. Gonzalez. Notably, any visits, prescription medications, or even the removal of the Penuma implant will require a new doctor such as Dr. Tajkarimi. Notably, under new billing arrangements. Thus, creating a financial hardship for Mr. Gonzalez.

However, until such arrangements can be made, Mr. Gonzalez will continue to suffer complications, including retraction, loss of sensation, and scarring. These complications cause and have caused Mr. Gonzalez significant pain and mental anguish.

## ALLEGATIONS

### 1. Defendants jointly developed and marketed the Penuma device and implantation procedure that caused Plaintiff's deformity.

Promoting himself as the "Thomas Edison of penis surgeries," Dr. Elist received a patent on the device that was later to be named "Penuma" in 2002. He applied for FDA clearance in 2004, analogizing the device to a silicone implant used for reconstructive surgery of the ear, nose, and throat. In this and all subsequent FDA clearance applications, Defendants specifically limited the intended use for the device to the "*correction of soft-tissue deformities*."

Beginning in 2004, Dr. Elist created National Medical Devices, Inc. ("NMD")—the predecessor of Defendant IMD—to manufacture the device and serve as its exclusive distributor. Through NMD, Dr. Elist began marketing the device and offering surgical services to implant the device from his clinic in Beverly Hills.

In 2013, Dr. Elist renamed NMD "International Medical Devices, Inc." Dr. Elist is the President of IMD and owns 100% of IMD. His son, Jonathan Elist, is IMD's chief executive officer.

Dr. Elist subsequently created Menova to hold the intellectual property associated with his silicone penile implant device. On January 10, 2016, Menova applied for trademark registration for the "Penuma" mark with the United States Patent and Trademark Office ("USPTO"). On September 20, 2016, the USPTO issued a trademark for "Penuma." Since that time, Menova has owned the Penuma trademark and all intellectual property rights associated with the device. Dr. Elist is the president of Menova and owns 100% of Menova.

In May 2017, IMD entered into an agreement with a Minnesota company for the distribution of Penuma devices. Menova and Dr. Elist have authorized IMD and the Minnesota company to contract with approximately 12 urologists around the United States to perform hundreds of Penuma implantation procedures and use the Penuma trademark. Dr. Elist personally trains all urologists authorized to implant the Penuma.

Penuma's advertising claims that the device will make patients' penises longer. That is false. There is no evidence that the Penuma device makes patients' non-erect penises longer. Worse, Penuma's design results in patients' erect penises becoming shorter in most cases and in many cases disfigured. Defendants have known about these complications for at least over half a decade. In a 2015 post titled "My Elist Implant Experience," a former patient detailed his effort at seeking a refund from Dr. Elist after his "erect length" shrank between 1–1.5" post-surgery. He received no refund. Similar patient complaints were posted on the internet during the same timeframe. Instead of correcting his false and misleading claims, Dr. Elist responded to these complaints with cease-and-desist letters. Patient concerns regarding the Penuma were echoed by

practitioners and academics as well. For example, a 2018 article published in the Journal of Sexual Medicine titled "Complications of Genital Enlargement Surgery" identified "major penile shortening and disabling curvature" as Penuma complications.

Instead of disclosing these material risks, Defendants directed consumers to a self-authored, and self-serving, Elist study from 2018 ("A Single-Surgeon Retrospective and Preliminary Evaluation of the Safety and Effectiveness of the Penuma Silicone Sleeve Implant for Elective Cosmetic Correction of the Flaccid Penis") throughout their marketing. This study, however, was not conducted according to scientific standards, and its unreliability has been noted in medical literature. Drs. Kapadia, Olson, and Furr, among others, concluded that Dr. Elist's study failed to consider "long-term sequelae of such adverse events and implant removal, such as penile shortening, fibrosis, and sexual dysfunction."[1] Because "the infection and explanation rate may be higher than reported in this retrospective study due to incomplete cohort response to surveys,"[2] several urologists have cautioned that "rigorous investigation with accurate reporting of complications should be mandated before more men take on the physical, mental, and significant financial burden associated with subcutaneous silicone penile implants."[3] Defendants' marketing failed to disclose and actively concealed these facts from consumers.

### 2. Plaintiff paid thousands of dollars for a product and service that had no value.

The total cost for purchase of the Penuma device and the implantation surgery ranges from $15,000–$20,000. Of this payment, approximately $6,000 is paid to IMD for purchase of

---

[1] Hehemann, *Penile Girth Enlargement Strategies: What's the Evidence?*, 7 SEXUAL MEDICINE REVIEW 535–547, 542 (2019).
[2] Olson, *Management of infected Penuma implant: Case Report*, 6 J. CASE REPORTS AND IMAGES IN UROLOGY 1–3, 2 (2021).
[3] Hehemann at 543.

AMENDED CIVIL COMPLAINT - 10

the Penuma device. Because the procedure is cosmetic, it is not covered by medical insurance. All Defendants profit, either directly or indirectly, from the sales of the Penuma device to patients.

Dr. Elist has performed thousands of Penuma implantation procedures at his clinic in Beverly Hills. He has also marketed and licensed his Penuma implantation procedures to 12 doctors nationwide, including Dr. Todd Kansas in Austin, Texas, who all perform the surgery in substantially the same manner, using the product and procedure developed by Dr. Elist in his Beverly Hills clinic, resulting in substantial profits to Defendants.

The actual value of the procedure, however, is non-existent. Instead of the cosmetic enlargement of the penis consumers were misled to expect, Penuma does not increase the length of patients' flaccid penises but causes disfigurement and scarring that often leads to a shortening of the erect penis in the majority of cases. The scarring also often interferes with normal penis function by reducing sensation in the penis, leading to sexual dysfunction.

Not only does the procedure not produce the cosmetic enhancement consumers are misled to expect, but it also frequently causes painful infections that lead to yet more scarring. A substantial number of men have had to have the Penuma device removed because of such infection and scarring, leading to a loss of sensation in and/or permanent shortening of the penis.

When infection, disfigurement, or other complications require the Penuma to be removed, patients suffer a significant shortening of their non-erect penises. Because the pseudo-capsule of scar tissue, which is attached to the penile shaft, contracts over time after removal of the Penuma device, patients' flaccid penises appear shorter—often one to two inches shorter. The same shortening appears in the erect penises of patients who have had the Penuma removed.

These complications have been well-reported in medical literature. A 2021 article specially identified "penile shortening and erectile dysfunction (ED)" as "reported complications

in literature" following Penuma removal.[4] A 2018 article also from the Journal of Sexual Medicine similarly identified "penile shortening due to fibrosis."[5]

Given these risks, reputable urologists recognize that penile implant procedures, including the Penuma procedure, are not safe and effective for cosmetic enhancement in men with normal penises. For example, the Mayo Clinic notes that penis-enlargement surgery is "experimental" and should be reserved for "men whose penises don't function normally because of a birth defect or injury":

> The need for penis-enlargement surgery is rare. Surgery is typically reserved for men whose penises don't function normally because of a birth defect or injury. Although some surgeons offer cosmetic penis enlargement using various techniques, it's controversial and considered by many to be unnecessary and in some cases permanently harmful. These surgeries should be considered experimental.

Mayo Clinic, *Penis-enlargement products: Do they work?*, available at https://www.mayoclinic.org/healthy-lifestyle/sexual-health/in-depth/penis/art-20045363 (last visited Sept. 23, 2021); see also *Marra, Systematic Review of Surgical and Nonsurgical Interventions in Normal Men Complaining of Penis Size*, 8 SEX. MED. REV. 158, 177 (2020) ("We believe that surgery should be a last resort, undertaken as an experimental treatment only in a clinical trial setting after expert psychosexual assessment.")

As a result of their reliance on Defendants' representations and omissions, consumers have suffered an ascertainable loss of money, namely, the cost of purchasing the Penuma device

---

[4] Kapadia et al., Evaluation and Treatment of Complications of Penuma Penile Implant, 18 JOURNAL OF SEXUAL MEDICINE 80 (2021).
[5] Furr et al., Complications of Genital Enlargement Surgery, 15 J. SEX. MED. 1811 (2018).

and procedure. Further, as a result of their deceptive marketing and unfair competition, Defendants realized sizable profits.

As the intended, direct, and proximate result of Defendants' false, misleading, and deceptive representations and omissions, Defendants have been unjustly enriched through sales of Penuma devices and procedures at the expense of Plaintiff.

If the Penuma device and procedure were redesigned to be safe and effective for cosmetic penile enlargement, FDA-cleared for this use, and truthfully marketed, there is a possibility that Plaintiff would purchase a Penuma device and procedure in the future.

Plaintiff suffered injuries in fact caused by the false, fraudulent, unfair, deceptive, and misleading practice alleged herein and accordingly seek restitution and injunctive relief.

### 3.  *Penuma has been FDA-cleared only for cosmetic correction of deformities.*

Because Penuma is a medical device, it is subject to the Medical Device Amendments of 1976 ("MDA") to the Food, Drug, and Cosmetic Act ("FDCA"). The MDA established three "classes" of medical devices: Class I, II, and III. "The three classes are based on the degree of control necessary to assure that the various types of devices are safe and effective."[6] A post-1976 medical device is automatically placed into Class III and is subject to premarket approval ("PMA") requirements, including the FDA's independent "scientific review to ensure the safety and effectiveness" of the device. The PMA process is highly rigorous, requiring manufacturers to submit detailed information regarding the safety and effectiveness of their devices. The FDA spends an average of 1,200 hours reviewing each submission.

---

[6] U.S. Food and Drug Administration, PMA Approvals, available at: https://www.fda.gov/medical-devices/device-approvals-denials-and-clearances/pma-approvals (last visited August 9, 2021).

AMENDED CIVIL COMPLAINT - 13

Devices that were on the market before the MDA was enacted, however, are grandfathered in and are not required to go through the PMA process. Manufacturers seeking a less stringent review can thus avoid the FDA's thorough, scientific PMA process by showing that their devices are "substantially equivalent" to devices that were already on the market in 1976. This less rigorous "clearance" to market a device based on substantial equivalency to a pre-1976 device is known as FDCA Section 510(k) Premarket Notification process (the "510(k) clearance" process).

Section 510(k) clearance allows device manufacturers, like Defendants, to submit a relatively short "summary" to the FDA describing how their medical devices are "substantially equivalent" to a pre-1976 device (the "predicate device"). The significant evidence needed to obtain full FDA approval of a medical device is not required when a medical device manufacturer instead applies for FDA "clearance" via the 510(k) process.

If the FDA determines that a device is "substantially equivalent" for the indicated uses to a pre-1976 device, manufacturers may obtain a fast-tracked 510(k) clearance to market the device while avoiding rigorous PMA testing for safety and effectiveness. 510(k) clearance is limited, however, to authorization to market the device for the indicated uses. In submitting a 510(k)-clearance application, the manufacturer must identify the device's intended use. This intended use must match the intended use of the pre-1976 device to which the manufacturer claims "substantial equivalency." See 21 C.F.R. § 807.81(a)(ii). If a major change or modification of the intended use is identified, the 510(k)-clearance process is unavailable, and the device must go through the full PMA process instead. Id.

On or about September 1, 2004, National Medical Devices, Inc. (the predecessor to IMD) submitted its "Silicone Block" for Section 510(k) premarket notification of intent to market the

device. National Medical Devices, Inc. submitted that the implant was substantially equivalent to an "ear, nose and throat synthetic polymer material," which is regulated as a Class II Device under 21 CFR § 874.3620, which provides:

> Ear, nose, and throat synthetic polymer material is a device material that is intended to be implanted for use as a space-occupying substance in the reconstructive surgery of the head and neck. The device is used, for example, in augmentation rhinoplasty and in tissue defect closures in the esophagus. The device is shaped and formed by the surgeon to conform to the patient's needs. This generic type of device is made of material such as polyamide mesh or foil and porous polyethylene.

On October 25, 2004, the FDA granted 510(k) clearance to the Silicone Block that "is *intended for use in the cosmetic correction of soft tissue deformities* and is contoured at the surgeon's discretion to create a custom implant to aid in the reconstruction process." (Emphasis added.)

Due to certain design changes to Dr. Elist's penile implant device, on December 20, 2016, Defendants caused International Medical Devices, Inc. ("IMD")—the successor to National Medical Devices—to submit a second Section 510(k) premarket notification for a "Pre-Formed Penile Silicone Block." This application identified National Medical Device's Silicone Block, which had been cleared in 2004 based on its asserted similarity to an ear, nose, and throat reconstructive implant, as the predicate device to which IMD's Pre-Formed Penile Silicone Block was "substantially equivalent." The FDA granted 510(k) clearance on February 1, 2017, describing the "Indications for Use" as follows: "Pre-Formed Penile Silicone Block is intended for use in the cosmetic correction of soft tissue deformities, and is contoured at the surgeon's discretion to create a custom implant." Following certain additional design changes, on December 19, 2018, IMD again applied for Section 510(k) premarket notification. Again, the

FDA's 510(k) clearance, dated January 23, 2019, identified the exact same "Indications for Use," i.e., limited to "**use in the cosmetic correction of soft tissue deformities.**"

Despite the clear limitations for which the device is FDA-cleared, Defendants regularly misrepresent Penuma as safe, effective, and FDA-cleared for cosmetic enlargement of normal penises. Penile soft tissue deformities, such as Peyronie's disease, congenital micropenis, and congenital ventral curvature, are serious medical conditions that can cause significant pain, prevent sexual intercourse, and shorten the penis. These deformities are rare, affecting a small percentage of the population. Consequently, the market for a device limited to "use in the cosmetic correction of soft tissue deformities" is relatively small.

However, a much larger market exists for the cosmetic enhancement of penis size in men with normal penises. Many healthy men desire larger penises for cosmetic reasons or to improve their sense of sexual self-confidence. This market, for which Penuma is neither safe, effective, nor FDA-cleared, is potentially worth millions. Seeking to capitalize on this lucrative market, Defendants regularly and falsely represent that Penuma is safe, effective, and FDA-cleared for "cosmetic enhancement" and advertise it as a penis enlargement device. In reality, Penuma is not safe or effective for this use and has not been FDA-cleared for such purposes. Defendants regularly fail to disclose and actively conceal these facts from consumers.

Defendants market Penuma on Dr. Elist's personal website, https://www.drelist.com/, as well as at http://www.penuma.com. Defendants advertise Penuma at www.*penuma*.com as a "Penis Enhancement Implant for Men." The same website claims that Penuma is "the first FDA-cleared penile implant for cosmetic enhancement." The website also claims that Penuma will cause "[s]ignificant, permanent cosmetic enhancements to the penis." The website is intended to and does cause a reasonable consumer to believe, falsely, that Penuma is safe and effective and

FDA-cleared for cosmetic enlargement of normal penises in healthy men. Nothing on the website discloses that Penuma is FDA-cleared only for use in the cosmetic correction of soft tissue deformities. Defendants have made these material misrepresentations and omissions consistently since at least 2017, and they continue to do so as of the date of the filing of this Complaint.

Defendants similarly market Penuma on Dr. Elist's website as "the first FDA-cleared penile implant for cosmetic enhancement." The website's tab identifies Dr. Elist as performing "Penile Enlargement Surgery" and urges men to "*achieve their desired penis size, girth, and flaccid length, bolstering confidence.*"

The websites are intended to and do cause a reasonable consumer to believe, falsely, that Penuma is safe and effective and FDA-cleared for cosmetic enlargement of normal penises in healthy men. Nothing on the websites discloses that Penuma is FDA-cleared only for use in the cosmetic correction of soft tissue deformities, that it is not effective to enhance the appearance of normal penises, or that it frequently causes complications that require the implant to be removed, causing permanent damage to the penis.

In fact, Defendants have no data to support any claim that Penuma will cause an increase in penile length. To the contrary, implantation of the Penuma device frequently causes scarring, resulting in the penis becoming shorter. When the Penuma is placed, a sheath of scar tissue—termed a "pseudocapsule"—forms around the entire foreign body. This is the body's reaction to healing. Because scar tissue does not stretch, when the penis fills with blood during an erection, the ventral surface of the penis stretches and becomes longer, but the dorsal surface is restricted by the pseudocapsule. This results in a dorsal curvature and apparent shortening of the erection. Neither IMD nor Dr. Elist acknowledges these complications. Instead, their website simply shuffles consumers to their self-published study—a study which Dr. Elist himself admits had

skewed results because over a hundred patients (approximately 24% of the potential pool) refused to participate.

Dr. Elist and IMD similarly tout that the post-Penuma penis is "natural looking," indicating that it is effective for cosmetic enhancement in men with normal, healthy penises; however, many patients experience a penguin or batwing shape post-surgery, causing the body of the penis to be wider than the head of the penis.

Defendants also claim that the Penuma procedure is "reversible." The prevailing medical literature disagrees, concluding that in "all patients in our series, corrective surgery resulted in both cosmetic and functional improvement. However, none resulted in a completely normal penis, as was the appearance prior to initial enhancement surgery."[7]

Defendants also claim that the Penuma implant causes no interference with normal penis function. Yet many patients experience sexual dysfunction, including loss of sensation, as a consequence of receiving the Penuma implant.

Defendants knew when they made these representations that Penuma was not safe and effective or FDA-cleared for cosmetic enhancement of normal penises and that the procedure frequently caused side effects requiring removal of the device. Defendants also knew that the Penuma procedure could not be reversed without permanent damage to the penis, but they nevertheless failed to disclose and actively concealed this information from Plaintiff.

Dr. Elist and other doctors performing Penuma implant surgery regularly refer patients to the Penuma website and Dr. Elist's website for information. Defendants intend for consumers to rely on their representations that Penuma is a safe, effective, FDA-cleared device for cosmetic

_____

[7]Furr, Complications of Genital Enlargement Surgery, 15 SEX. MED. REV. 1811–17, 1816 (2018) (emphasis added).

AMENDED CIVIL COMPLAINT - 18

penile enlargement that is permanent and reversible. Thousands of reasonable consumers did, in fact, rely on these representations.

Plaintiff purchased the Penuma device and underwent the implantation procedure based on Defendants' misrepresentations that Penuma was safe, effective, FDA-cleared for cosmetic enhancement, and permanent yet reversible without negative consequences. Defendants also claimed the implant would result in a natural-looking penis and would not interfere with normal function. Had Plaintiff known that Penuma was neither safe nor FDA-cleared for cosmetic enhancement, that there was no data supporting increased penis length, that the implant often interfered with normal function, and that complications frequently required device removal, resulting in permanent damage, they would not have proceeded with the purchase or procedure.

## CLAIMS

### COUNT ONE – Violation of TEX. BUS. & COM. CODE § 17.41 et seq. ("DTPA")

Plaintiff incorporates by reference all of the foregoing allegations as if they were fully set forth here.

Plaintiff brings this claim against all Defendants.

The DTPA provides that "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." TEX. BUS. & COM. CODE § 17.46(a). It is also unlawful under the DTPA to disseminate statements concerning property or services that are "false, misleading, or deceptive." Id.

As alleged herein, Defendants' advertisements relating to the Penuma device and implantation procedure misled reasonable consumers as to the uses for which Penuma had been cleared for use by the FDA, as to its safety and effectiveness for use as a penis enlargement device, and as to whether the procedure was permanent, natural looking, and reversible.

AMENDED CIVIL COMPLAINT - 19

Defendants' business practices alleged herein constitute deceptive, untrue, and misleading advertising pursuant to the DTPA because Defendants knew or reasonably should have known that their advertisements were untrue and misleading, and Defendants omitted material information from their advertising.

Defendants profited from their sale of the falsely and deceptively advertised device and procedure.

As a result, Plaintiff is entitled to injunctive and equitable relief, restitution, and an order for the disgorgement of the funds by which Defendants were unjustly enriched.

**COUNT TWO – Violation of Texas Consumer Protection Act,**

**TEX. BUS. & COM. CODE § 17.41 et seq. ("TCPA")**

Plaintiff incorporates by reference all of the foregoing allegations as if they were fully set forth here.

Plaintiff brings this claim against all Defendants.

The Texas Consumer Protection Act ("TCPA") prohibits deceptive practices in connection with the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

Defendants are "person(s)" as defined by TEX. BUS. & COM. CODE § 17.45(3).

Plaintiff is a "consumer" within the meaning of TEX. BUS. & COM. CODE § 17.45(4) because he purchased the Penuma device and procedure for personal purposes.

Defendants' false and misleading advertising was designed to and did induce the purchase of the Penuma device and implantation procedure for personal, family, or household purposes by Plaintiff, in violation of the following sections of the TCPA: (a) § 17.46(b)(5): representing that goods have characteristics, uses, or benefits which they do not have; (b) § 17.46(b)(7):

representing that goods are of a particular standard, quality, or grade if they are of another; and (c) § 17.46(b)(9): advertising goods with intent not to sell them as advertised.

Defendants knew the Penuma device and procedure did not possess the characteristics and benefits as represented and were not of the particular standard, quality, or grade as represented by their website, and as viewed by Mr. Gonzalez at his home in Webb County, Texas. https://www.accessdata.fda.gov/scripts/cdrh/devicesatfda/index.cfm?db=pmn&id=K042380.

Defendants had a duty to Plaintiff to disclose the scope of intended uses for which the Penuma device and procedure were safe and effective and FDA-cleared because: (a) Defendants were in a superior position to know the scope of intended uses for which the Penuma device and procedure were safe and effective and FDA-cleared; (b) Plaintiff could not reasonably have been expected to know the scope of intended uses for which the Penuma device and procedure were safe and effective and FDA-cleared; and (c) Defendants knew that Plaintiff could not reasonably have been expected to know the scope of intended uses for which the Penuma device and procedure were safe and effective and FDA-cleared.

In failing to disclose and misrepresenting the scope of intended uses for which the Penuma device and procedure were safe and effective and FDA-cleared, Defendants knowingly and intentionally concealed material facts and breached their duty not to do so.

The facts Defendants concealed from and/or misrepresented to Plaintiff are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase the Penuma device and procedure. If Plaintiff had known that Penuma was not safe and effective or FDA-cleared for cosmetic enhancement of normal penises, or that it was not permanent and frequently led to complications requiring removal, causing permanent damage to the penis, he would not have purchased the device and procedure.

Plaintiff is a reasonable consumer who expects device manufacturers and medical service providers like Defendants to provide accurate and truthful representations regarding the safety and efficacy of their products. Further, reasonable consumers, like Plaintiff, rely on the representations made by device manufacturers and medical service providers regarding the safety and efficacy of their medical devices in determining whether to purchase and consider that information important to their purchase decision.

Defendants profited from the sale of the falsely, deceptively, and unlawfully advertised device and procedure to consumers.

Defendants' wrongful business practices constituted, and constitute, a continuing course of conduct in violation of the Texas Deceptive Trade Practices Act (DTPA) and Texas Consumer Protection Act (TCPA).

Pursuant to the provisions of TEX. BUS. & COM. CODE § 17.50(a), Plaintiff will provide a letter to Defendant concurrently with the filing of this complaint with notice of its alleged violations of the DTPA and TCPA, demanding that Defendants correct such violations, and providing them with the opportunity to correct their business practices. If Defendants do not thereafter correct their business practices, Plaintiff will amend the complaint to add claims for monetary relief, including restitution under the DTPA and TCPA.

## COUNT THREE – Violation of Texas Deceptive Trade Practices Act, TEX. BUS. & COM. CODE § 17.41 et seq. ("DTPA")

Plaintiff incorporates by reference all of the foregoing allegations as if they were fully set forth here.

Plaintiff brings this claim against all Defendants.

The DTPA prohibits acts of unfair competition, including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." TEX. BUS. & COM. CODE § 17.46.

Defendants' business acts and practices alleged herein are unlawful in that they violate: (d) The False Advertising Law, TEX. BUS. & COM. CODE §§ 17.12 et seq.; (e) The Texas Consumer Protection Act, TEX. BUS. & COM. CODE §§ 17.41 et seq.; (f) The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301 et seq.; and (g) The Texas Food, Drug, and Cosmetic Act, TEX. HEALTH & SAFETY CODE §§ 431.001 et seq.

Defendants' conduct alleged herein was also unfair because this conduct is immoral, unethical, unscrupulous, and substantially injurious to consumers. The utility of Defendants' conduct is non-existent and does not outweigh the gravity of the harm to Plaintiff.

Defendants' conduct is also unfair because it violates public policy as declared by specific statutory and regulatory provisions, including but not limited to the applicable sections of the False Advertising Law, the Texas Consumer Protection Act, the Federal Food, Drug, and Cosmetic Act, and the Texas Food, Drug, and Cosmetic Act.

Defendants' conduct is also unfair because it violates public policy as declared by specific statutory and regulatory provisions, including but not limited to the applicable sections of the False Advertising Law, the Texas Consumer Protection Act, the Federal Food, Drug, and Cosmetic Act, and the Texas Food, Drug, and Cosmetic Act.

Defendants' conduct alleged herein was also fraudulent because an objective, reasonable consumer is likely to be misled by Defendants' claims to believe that Penuma is safe and effective and FDA-cleared for cosmetic enhancement of normal penises, as well as that the procedure is permanent and reversible.

Defendants profited from their sale of the falsely, deceptively, and unlawfully advertised device and procedure to consumers.

Plaintiff is likely to continue to be damaged by Defendants' deceptive trade practices, because if the Penuma device and procedure were redesigned to be safe and effective for cosmetic penile enlargement, FDA-cleared for this use, and truthfully marketed, there is a possibility that Plaintiff would purchase a Penuma device and procedure in the future. Thus, injunctive relief enjoining Defendants' false and misleading advertising is proper.

Defendants' conduct has caused and continues to cause substantial injuries in fact to Plaintiff. As a result of his reliance on Defendants' misrepresentations and omissions, Plaintiff suffered ascertainable losses of money and property—namely the money he paid for the valueless Penuma device and implantation procedure. Additionally, the money Plaintiff will spend on removal or replacement of the failed device.

In accordance with TEX. BUS. & COM. CODE § 17.50(b), Plaintiff seeks an order enjoining Defendant from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices.

## CONCLUSION AND PRAYER

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment ordering relief as follows:

(a) Enjoining Defendants from further deceptive advertising, marketing, and other false and misleading business practices with respect to their representations regarding the Penuma device and procedure;

(b) Enjoining Defendants to cease and desist stating that Penuma is "FDA cleared for cosmetic enhancement" on their websites and in advertisements and other marketing materials

AMENDED CIVIL COMPLAINT - 24

without disclosing that it is cleared for use only for "***use in the cosmetic correction of soft tissue deformities***";

   (c) Awarding Plaintiff an amount of $2,800,000 plus restitution in an amount to be proven at trial;

   (d) Awarding Plaintiff reasonable attorneys' fees, expenses, and costs of suit pursuant to TEX. CIV. PRAC. & REM. CODE § 38.001;

   (e) Awarding pre-judgment and post-judgment interest, as provided by law;

   (f) Granting leave to amend the Complaint to conform to the evidence produced at trial; and;

   (g) Awarding such other relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

   Plaintiff hereby demands a trial by jury on all issues so triable.

**Dated this 25th day of November 2024.**

Jose M. Gonzalez, Pro Se
1215 Hidalgo Street #205
Laredo, TX 78040
(956) 608-1811
middlemanadvert@gmail.com

AMENDED CIVIL COMPLAINT - 25

1    **2018**:



Figure 1: www.*drelist*.com

# ADVANTAGES

PENUMA® IS THE FIRST FDA-CLEARED PENILE IMPLANT FOR ENHANCEMENT.
KEY IMPLANT AND OPERATIVE/POST-OPERATIVE FEATURES INCLUDE:

| Implant Features | Operative and Post-Operative Features |
|---|---|
| Significant, permanent enhancements to the penis | Short, outpatient procedure (i.e., 45-60 minutes) |
| Natural Looking | No incisions or scar formation on the penis |
| Reversible | Short recovery time (i.e., patient return to routine daily activities within 2-4 days) |
| No interference with penile function | Strong track record of effectiveness and patient and partner satisfaction |
| No blockage of, or interference with, the urethra (e.g., for future cystoscopy) | Low adverse event rate on par with silicone implants for other anatomical regions (e.g., calf, buttock, chin) |
| Implant is contoured by the surgeon to your individual size | Can be performed before or after a penile prosthesis procedure for the treatment of erectile dysfunction |
| Manufactured in the US by an ISO-certified, FDA-registered facility | |

Figure 3: *https://web.archive.org/web/20180626111235/http://www.penuma.com/*

## FEATURES OF
## THE PENUMA® IMPLANT

The Penuma® Implant is designed to offer natural and aesthetic looking
enhancements. This implant is done exclusively by Dr. Elist and on a limited basis
by a select group of top surgeons across the US. The features of the Penuma®
Implant include:

- Enhanced and natural feel and appearance
- Potential increases in penis width and flaccid length
- Permanent results
- Reversible at any time
- No interference with normal penis function
- Completely customizable implant to perfectly suit your needs
- Made of medical grade silicone, that is soft and feels natural but does not
  have a gel core (like many breast implants)



Figure 4: *https://web.archive.org/web/20201001025806/https://www.drelist.com/penile-procedures/penuma-implant/*

**2019**:



PENILE
ENLARGEMENT

Surgery
—

Enhance and enlarge the length, girth, and size
of your penis. Looks, feels, and functions just like
nature intended – just significantly larger.

Learn More | Gallery

Figure 5: https://web.archive.org/web/20190714095548/https://www.drelist.com/

AMENDED CIVIL COMPLAINT - 28

# ADVANTAGES

PENUMA® IS THE FIRST 510(K)-CLEARED PENILE IMPLANT FOR COSMETIC ENHANCEMENT.

KEY IMPLANT AND OPERATIVE/POST-OPERATIVE FEATURES INCLUDE:

| Implant Features | Operative and Post-Operative Features |
| --- | --- |
| Significant, permanent cosmetic enhancements to the penis | Short, outpatient procedure (i.e., 45-60 minutes) |
| Natural Looking | No incisions or scar formation on the penis |
| Reversible | Short recovery time (i.e., patient return to routine daily activities within 2-4 days) |
| No interference with penile function | Strong track record of effectiveness and patient and partner satisfaction |
| No blockage of, or interference with, the urethra (e.g., for future cystoscopy) | Low adverse event rate on par with silicone implants for other anatomical regions (e.g., calf, buttock, chin) |
| Implant is contoured by the surgeon to your individual size | Can be performed before or after a penile prosthesis procedure for the treatment of erectile dysfunction |
| Manufactured in the US by an ISO-certified, FDA-registered facility | |

Figure 6: *https://web.archive.org/web/20190609121832/https://www.penuma.com/*

AMENDED CIVIL COMPLAINT - 29

**2020**:



Figure 7: https://web.archive.org/web/20200701020552/https://www.drelist.com/

# ADVANTAGES

PENUMA® IS THE FIRST 510(K)-CLEARED PENILE IMPLANT FOR
COSMETIC ENHANCEMENT.

KEY IMPLANT AND OPERATIVE/POST-OPERATIVE FEATURES INCLUDE:

| Implant Features | Operative and Post-Operative Features |
|---|---|
| Significant, permanent cosmetic enhancements to the penis | Short, outpatient procedure (i.e., 45-60 minutes) |
| Natural Looking | No incisions or scar formation on the penis |
| Reversible | Short recovery time (i.e., patient return to routine daily activities within 2-4 days) |
| No interference with penile function | Strong track record of effectiveness and patient and partner satisfaction |
| No blockage of, or interference with, the urethra (e.g., for future cystoscopy) | Low adverse event rate on par with silicone implants for other anatomical regions (e.g., calf, buttock, chin) |
| Implant is contoured by the surgeon to your individual size | Can be performed before or after a penile prosthesis procedure for the treatment of erectile dysfunction |
| Manufactured in the US by an ISO-certified, FDA-registered facility | |

Figure 8: https://web.archive.org/web/20190609121832/https://www.penuma.com/

AMENDED CIVIL COMPLAINT - 31

1

**Today**:



Figure 9: *https://www.drelist.com/*



Figure 10: https://penuma.com/

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





Fig. 1
https://www.drelist.com/areas-serve/dallas-fort-worth
Last visited 11/25/2024

Fig. 2
https://www.drelist.com/areas-serve/houston
Last visited 11/25/2024

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## Indications for Use

510(k) Number (if known):    *KO4 2380*

Device Name:         Silicone Block

Indications For Use:

The Silicone Block is intended for use in the cosmetic correction of soft tissue
deformities, and is contoured at the surgeon's discretion to create a custom implant to
aid in the reconstruction process.

Prescription Use ___X___         AND/OR        Over-The-Counter Use _____
(Part 21 CFR 801 Subpart D)                                    (21 CFR 801 Subpart C)

   (PLEASE DO NOT WRITE BELOW THIS LINE-CONTINUE ON ANOTHER PAGE IF
NEEDED)

_____

Concurrence of CDRH, Office of Device Evaluation (ODE)

*Miriam C Provost*
**(Division Sign-Off)**
**Division of General, Restorative,**
**and Neurological Devices**                    Page 1 of _____

**510(k) Number** *K042380*

AMENDED CIVIL COMPLAINT - 34

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### CERTIFICATE OF SERVICE

I, Jose M. Gonzalez, Plaintiff pro se, do hereby certify that on the 26th Day of November

2024, a true and correct copy of the foregoing AMENDED CIVIL COMPLAINT was filed with

the Clerk using the ECF system which will give notice of the filing to all counsel of record AND

a hard-copy was also forwarded to, the following Registered Agents for the Defendants by

United States Postal Mail Certified with Signature Requested AND WAIVER OF SERVICE

FORM at the following addresses:

### Defendants:

**International Medical Devices, Inc.**
**("IMD")** is a California corporation
located at 717 N. Maple Drive, Beverly
Hills, CA 90210, in Los Angeles County.
Registered agent, Jonathan Elist, at the same
address.
**Menova International, Inc., ("Menova")**
is a California corporation located
at 8500 Wilshire Blvd., Suite 707, Beverly
Hills, CA 90211, in Los Angeles County.

**James J. Elist, M.D.**, a Medical
Corporation, is a California corporation
headquartered at 8500 Wilshire Blvd., Suite
707, Beverly Hills, CA 90211.
**Dr. James Elist** is an individual residing in
Beverly Hills, California.
Dr. Elist; 8500 Wilshire Blvd., Suite 707,
Beverly Hills, CA 9021

DATE: **11/26/2024**

/s/  **Jose M. Gonzalez, Pro Se**
1215 Hidalgo Street #205
Laredo, TX 78040
(956) 608-1811
middlemanadvert@gmail.com