UNITED STATES DISTRICT COURT
**WESTERN DISTRICT OF TEXAS**

JOSE M. GONZALEZ,

    *Plaintiff*,

             v.                      Case No.: **1:24-cv-00982-DAE**

INTERNATIONAL MEDICAL DEVICES, INC., et al.,

    *Defendants*.

**PLAINTIFF'S MOTION TO DENY DEFENDANTS' MOTION TO DISMISS**

Plaintiff, Jose M. Gonzalez, respectfully submits this Motion to Deny Defendants' Motion to Dismiss and states as follows:

## I.    INTRODUCTION

Defendants seek dismissal of this case by challenging personal jurisdiction and the sufficiency of Plaintiff's claims under the Texas Deceptive Trade Practices Act (DTPA) and failure-to-warn theories. However, Defendants have actively conducted business in Texas, misrepresented the FDA clearance of their product, and failed to warn both consumers and physicians about significant risks. At the very least, these issues warrant discovery.

## II.    DEFENDANTS PURPOSEFULLY AVAILED THEMSELVES OF TEXAS JURISDICTION

The Defendants argue that this Court lacks personal jurisdiction, yet the facts clearly establish that Defendants directed business activities into Texas by:

1. **Training and certifying Texas-based physicians (Dr. Kansas in Austin, TX) to perform the Penuma procedure.**

In an authenticated presentation titled "*The History of Penile Enlargement and the Advent of Penuma*," Dr. James Elist outlines not only the technical evolution of the procedure but also the deliberate construction of a nationwide network of qualified physicians. [See dkt# 28-3; p.3-37: Grand Rounds Transcript]. Notably, Dr. Elist explicitly mentions physicians such as Dr. Kansas—a Texas-based practitioner—who is integral to this network. This network is designed to perform up to five to six procedures per week, with rigorous patient screening (via telemedicine consultations, comprehensive psychological evaluations, and strict physical criteria) ensuring that patients from targeted markets, including Texas, are effectively served.

2. **Directly scheduling Texas patients, including Plaintiff, with Texas doctors.**

The operation's extensive postoperative management, which includes coordinated hotel transfers and daily follow-up calls, further demonstrates that the Defendants have adopted a systematic approach to drawing patients from across the country, with Texas serving as a key jurisdiction. [See dkt# 28-3; p.27: Grand Rounds Transcript].  Moreover, Dr. Elist's detailed explanation of the FDA clearance process—highlighting that significant modifications require separate 510(k) submissions—substantiates that each iteration of the Penuma device is materially distinct. [*id*.; p.20]. These factual details conclusively demonstrate that the Defendants purposefully avail themselves of Texas by creating and maintaining a refined, strategic network of trained physicians and by engaging in targeted patient recruitment and follow-up.

3. **Marketing to Texas consumers via online advertisements, email newsletters, and physician referrals.**

Defendants have implemented a targeted marketing campaign aimed specifically at Texas consumers. [See dkt# 28-3; p.11: Grand Rounds Transcript "*i had the patience you know from Texas*"]. Their strategy includes the use of online advertisements and email newsletters that clearly promote the Penuma procedure in association with Texas-based clinics and services. Additionally, the organization has actively encouraged physician referrals by coordinating with local practitioners to direct potential patients to their facilities. These marketing efforts are not incidental or casual; they are a deliberate and systematic campaign designed to raise awareness and generate business within the Texas market. This targeted promotional activity underscores Defendants' intent to engage with consumers in Texas on a continual basis.

4. **Controlling product distribution in Texas by restricting access to the Penuma device through their approved network.**

Defendants maintain strict control over the distribution of the Penuma device by confining access exclusively to their approved network of physicians and clinics in Texas. This controlled network is designed so that only those who remain active members can receive the device. Notably, Dr. Kansas has maintained that once he withdrew from the Penuma Network, he was no longer able to obtain any models for implantation. [See dkt# 28-2; p.8-11; ex. D&E]. This fact underscores the deliberate strategy by Defendants to regulate supply within their network, effectively restricting distribution to encourage ongoing participation from targeted Texas-based providers.

Under the Fifth Circuit's interpretation of personal jurisdiction principles, a defendant purposefully avails itself of a forum state by engaging in conduct that creates a substantial connection with the forum. See *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 481 F.3d 309, 311 (5th Cir. 2007). In *Ford Motor Co. v. Montana*, 141 S. Ct. 1017 (2021), the Supreme Court reinforced that a company targeting a forum with its products is subject to jurisdiction there, even if headquartered elsewhere. Similarly, in *LG Chem Am., Inc. v. Morgan*, 670 S.W.3d 341 (Tex. 2023), the Texas Supreme Court ruled that foreign corporations cannot avoid Texas jurisdiction when their products are distributed and used in the state.

Here, the Defendants controlled the entire process—from training and scheduling to marketing and product distribution—in a deliberate and systematic manner that centers on Texas. This comprehensive engagement with the Texas market is more than sufficient to establish personal jurisdiction.

### III.    DEFENDANTS MISREPRESENTED FDA CLEARANCE STATUS

### 1. <u>FDA's Authority and Regulatory Framework</u>

In the Defendants' Reply in Support of Defendants' Motion to Dismiss, they assert that a manufacturer's intentions—rather than the FDA's official determinations—dictate a product's lawful use. [dkt# 27]. For example, they argue that "these numbers represent different 510(k) Pre-market notification applications IMD submitted for the same 'Pre-Formed Silicone Penile Block' which is clearly seen when the two are viewed side-by-side…" [*id*.; p. 3–4]. This argument is fundamentally flawed. The FDA's formal clearance process is the sole determiner of a medical device's intended use because clearance is based entirely on the agency's independent findings.

The chart presented in Plaintiff's Motion to Deny the Defendants' Motion to Dismiss [*id*; p.5] clearly shows that each 510(k) submission is evaluated on its own merits under the agency's regulatory scheme. In contrast to the Defendants' side-by-side comparison—which contrasts only their pleadings—the Plaintiff's approach juxtaposes the ultimate, official determinations made by the FDA.

Moreover, it is standard regulatory practice that a new 510(k) submission is required when a device undergoes a material change that could affect its safety or effectiveness. FDA guidance confirms that such substantial modifications—necessitating a new submission—reflect inherent differences in the device. In fact, if the Defendants already had a cleared model or device, it is entirely perplexing that they would invest significant time and resources into seeking another 510(k) clearance for what is essentially the same product. Notably, the Defendants offer no specific clarification or supporting evidence from the FDA to justify their position, which suggests that their argument is intended solely to challenge the Court's understanding of the device's regulatory status.

The foregoing analysis is supported by binding authority, including *Buckman Co. v. Plaintiffs' Legal Comm*., 531 U.S. 341, 348; *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 478; and the FDA guidance "Deciding When to Submit a 510(k) for a Change to an Existing Device" along with 21 C.F.R. § 807.81(a)(3).

## 2. <u>Evidentiary Misrepresentations and the Learned Intermediary Defense</u>

Defendants contend that all Penuma devices are uniformly FDA-cleared for augmentation, implying that the multiple 510(k) submissions merely represent routine administrative filings for what is essentially one product. According to their position, no

substantive differences exist among the various iterations of the device. However, the evidence demonstrates that the specific Penuma model implanted in Plaintiff (K181387) was not cleared for augmentation; only a subsequent iteration—most notably the Himplant model (K220760)—was cleared for that indication. This fact alone shows that there exists a material difference in regulatory determination between the devices.

This position, however, is a double-edged sword. If the Court were inclined to agree that the devices are in fact one and the same, rendering the different 510(k) clearances irrelevant, then it must also accept that Dr. Kansas was misinformed in believing that a "newer model" would fix the issues due to its purported robustness. [See dkt# 28-2; p.8-11; ex. D&E]. In other words, if the devices are identical, Dr. Kansas's analysis and subsequent discontinuation of the procedure based on the promise of improved performance from a "*newer model*" would be inexplicable. [id.; p.8].

Conversely, if the Court finds that the differences between the 510(k) submissions are significant—implying that the FDA's independent determinations distinguish one model from another—then Defendants' blanket assertion that all Penuma devices are FDA-cleared for augmentation becomes disingenuous. In this scenario, the authenticated transcripts, in which Defendants claim the device is "FDA approved," further support the argument that they purposefully misrepresented the actual regulatory status of their product. [See dkt# 28-3; p.3-37: Grand Rounds Transcript]. Despite their effort, noted in a footnote, to render Dr. Elist's statements immaterial, the evidence of misrepresentation remains clear. [dkt# 27; p. 4; footnote # 5].

In either interpretation, Defendants' position unravels to reveal that a trained physician like Dr. Kansas was ill-informed, or it underscores that Defendants intentionally

misrepresented the true regulatory status of their product. Such misrepresentations not only mislead consumers but also constitute a deceptive trade practice under *Texas law. See Tex. Bus. & Com. Code* § 17.46(b)(24); see also *United States v. Prigmore*, 243 F.3d 1, 17 (5th Cir. 2001).

## IV.    FAILURE-TO-WARN CLAIM IS PROPERLY PLEADED

Defendants argue that Plaintiff's failure-to-warn claim is barred by the learned intermediary doctrine. However, a manufacturer's duty to provide accurate risk information to its physician-intermediaries cannot be discharged by furnishing false or misleading representations.

In the authenticated transcript of Dr. James Elist's presentation, he repeatedly refers to the Penuma device as "FDA approved," stating, for example, that his implant "got the first FDA approval" and is "the only and the first FDA approved subcutaneous penile process." [See dkt# 28-3; p.20: Grand Rounds Transcript]. Under FDA regulatory language, however, the term "approval" is reserved for devices that have undergone the rigorous premarket approval (PMA) process, whereas a device cleared through a 510(k) submission should properly be described as "FDA cleared." Thus, Defendants' use of "approved" in place of "cleared" creates a material misrepresentation of the level of regulatory review and safety evaluation—one that is inherently misleading to physicians assessing the product's risk profile.

Further compounding this error, Plaintiff's email correspondence from Dr. Bryan Kansas provides direct evidence of the impact of these misrepresentations on clinical judgment. [See dkt# 28-2; p.8-11; ex. D&E]. In his August 8, 2023, email, Dr. Kansas

informed Plaintiff, "*First of all I stopped doing Penuma. I did well over 200 but the 3–5% that had imperfect results drove me to no longer want to do them*," and he subsequently outlined revision options—even though he acknowledged that he no longer had access to the newer, supposedly improved models. [*id*.; p. 8]. This statement shows that even a highly experienced physician, who performed over 200 procedures, was influenced by Defendants' erroneous labeling of the device as "FDA approved" and thus expected a level of performance that ultimately failed to materialize.

Consequently, by persistently misrepresenting the device's regulatory status—erroneously implying full FDA approval rather than mere 510(k) clearance—Defendants have provided false and misleading information that completely undermines the learned intermediary defense. The doctrine is intended to shield manufacturers only when they furnish complete and accurate risk disclosures to their physician-intermediaries, thereby enabling these experts to counsel their patients properly. Here, the evidence unmistakably shows that Defendants breached that duty.

Accordingly, based on the authenticated transcript of Dr. Elist's presentation and the email communications from Dr. Kansas, Defendants' failure to provide accurate and comprehensive risk information renders the learned intermediary defense inapplicable. In support of this conclusion, see *Buckman Co. v. Plaintiffs' Legal Comm.,* 531 U.S. 341, 348; *Centocor, Inc. v. Hamilton*, 372 S.W.3d 140, 144; and Perez v. Wyeth Labs., Inc., 734 A.2d 1245, 1255.

## V.    REQUEST FOR JUDICIAL NOTICE

Pursuant to Federal Rule of Evidence 201, Plaintiff respectfully requests that this Court take judicial notice of the following publicly available and verifiable materials:

1. **Marketing Emails:** The marketing emails received in the normal course of business, which clearly illustrate the Defendants setting appointments with Texas practitioners. [See dkt# 28-2; p.4: February 28, 2022; ex. B].

2. **The Grand Rounds Transcript**: The transcript of the Grand Rounds presentation, which is readily accessible via third-party websites, and in which Dr. Elist made statements regarding the Penuma network and the device's clearance status. [See dkt# 28-3; p.20: Grand Rounds Transcript].

These are publicly available, verifiable materials that directly refute Defendants' claims. That stated, in response to the Defendants' prior objection to the unauthenticated transcript appended in ECF No. 26, Plaintiff now submits a revised transcript accompanied by a timestamped, notarized affirmation establishing its origin. [dkt# 28-3]. This certification unequivocally satisfies the requirements for authentication under Federal Rule of Evidence 901, which mandates that the proponent produce sufficient evidence to support a finding that the item is what it is purported to be. See Fed. R. Evid. 901(a); Fed. R. Evid. 901(b)(4).

Moreover, the Fifth Circuit's decision in *United States v. Clark*, 108 F.3d 193 (5th Cir. 1997), supports the admission of notarized affidavits as evidence of authenticity, and a similar conclusion was reached in *In re Grand Jury Subpoenas*, 492 F. Supp. 2d 973 (S.D.N.Y. 2007), where notarized documents were found to satisfy evidentiary requirements.

The authenticated transcript now clearly verifies that, during his 2021 presentation, Dr. Elist identified key aspects of the training provided to Texas-based physicians, including Dr. Kansas. This evidence underscores the Defendants' deliberate engagement in activities directed toward Texas, thereby establishing the necessary nexus for personal

jurisdiction. Although Defendants previously argued that the transcript failed to connect their actions to personal jurisdiction, the authenticated evidence now conclusively demonstrates that the training of Dr. Kansas—a focal point in the FAC—was part of a broader scheme by the Defendants involving targeted interactions within Texas.

Accordingly, any contention that the transcript fails to support a prima facie case for personal jurisdiction is foreclosed by its now verified status and the contemporaneous corroboration of the underlying facts.

## VI.  IN THE ALTERNATIVE, DISCOVERY SHOULD BE ALLOWED

If the Court finds any deficiencies in Plaintiff's pleadings, dismissal is not warranted at this stage. Instead, Plaintiff requests the opportunity for limited jurisdictional and evidentiary discovery to resolve the key factual issues underlying these claims. Federal courts have long recognized that "when genuine factual disputes exist—especially on matters of jurisdiction and deceptive trade practice claims—discovery should be permitted prior to any dismissal." See, e.g., *Matthias v. Bingley*, 906 F.2d 1047 (5th Cir. 1990). In the present case, depositions of Dr. Kansas concerning his training and his understanding of the device's regulatory status, as well as those of Allison Komiyama[1]—the consultant who guided Defendants through the FDA approval process and who provided crucial insights regarding the representations made to Defendants—would swiftly clarify these issues and cut directly to the merit of Plaintiff's claims.

---

[1]     See 26-2; p.11, which identifies Allison Komiyama as the signatory on the FDA approval documents previously submitted to this Court.

## VII.    IN THE ALTERNATIVE, PLAINTIFF REQUESTS LEAVE TO AMEND

If Defendants believe they are somehow disadvantaged by the cumulative information spread across multiple filings, then Plaintiff should be granted leave to file a Second Amended Complaint. However, as the purpose of an amendment is to ensure Defendants are properly notified of the allegations, and as Defendants, despite their procedural objections, have had no difficulty rebutting each claim, they can claim no prejudice or surprise.

## VIII.    CONCLUSION

For these reasons, Plaintiff respectfully requests that this Court DENY Defendants' Motion to Dismiss and allow this case to proceed to discovery. In the alternative, should the Court find any deficiencies in the pleading, Plaintiff requests leave to amend rather than dismissal.

Respectfully submitted,

/s/ Jose M. Gonzalez

Plaintiff, Pro Se
1215 Hidalgo Street #205
Laredo, TX 78040
(956) 608-1811
middlemanadvert@gmail.com

## <u>CERTIFICATE OF SERVICE</u>

I, Jose M. Gonzalez, Plaintiff pro se, do hereby certify that on the 13th Day of March 2025, a true and correct copy of the foregoing and all attachments thereto were filed with the Clerk using the ECF system which will give notice of the filing to all counsel of record.

DATE: 03/13/2025

/s/   Jose M. Gonzalez, Pro Se

1215 Hidalgo Street #205

Laredo, TX 78040

(956) 608-1811

middlemanadvert@gmail.com