# EXHIBIT A

```
1              UNITED STATES DISTRICT COURT
2              WESTERN DISTRICT OF TEXAS
3    _____
4    JOSE M. GONZALEZ,
5              Plaintiff,
6        v.                        Case No.
7    INTERNATIONAL MEDICAL DEVICES,    1:24-cv-00982-DAE
8    INC., et al.,
9              Defendants.
10   _____
11              VIDEOTAPED DEPOSITION OF
12                BRYAN T. KANSAS, MD
13   DATE:        Friday, December 19, 2025
14   TIME:        1:11 p.m.
15   LOCATION:    Bowman & Brooke LLP
16                2901 Via Fortuna Drive, Suite 500
17                Austin, TX 78746
18   OFFICIATED BY: William De Bolt
19   JOB NO.:     7774588
20
21
22
23
24
25
```

Page 1

```
1                        by stenographic means; and
2                    - shall constitute written stipulation
3                        of such.
4                    At this time will everyone in
5      attendance please identify yourself for the record,
6      beginning --
7                        MR. SMITH:  Jonathan Smith -- for
8      Defendants.
9                        DR. KANSAS:  Bryan Kansas, urologist.
10                       MR. GONZALEZ:  Jose Gonzalez,
11     Plaintiff.
12                       THE OFFICER:  Thank you.  Hearing no
13     objection, I will now swear in the witness.
14                       Please raise your right hand.
15     WHEREUPON,
16                    BRYAN T. KANSAS, MD,
17     called as a witness and having been first duly sworn
18     to tell the truth, the whole truth, and nothing but
19     the truth, was examined and testified as follows:
20                       THE OFFICER:  Counsel, you may proceed.
21                       MR. SMITH:  Thank you.
22                       EXAMINATION
23     BY MR. SMITH:
24         Q    Dr. Kansas, thank you for being here.  And I
25     know we just met, but for the record, would you state
```

Page 5

1    them.

2          However, I was also not at a point in my

3    career where I needed to do a six-year long residency

4    and do a hundred of them.  It's something that once

5    you do a couple of them, you're pretty good at them.

6          Q    And you said that you, for the reasons

7    stated, phased them out of your practice in June of

8    2023 and that you had done it for about three years.

9    So that means you -- am I right, ballparking June

10    2020-ish is when you began?

11          A    It was August.

12          Q    Of 2020?

13          A    Yeah, so it was -- it was just under three

14    years that I did them.

15          Q    My historical timeline is off.  Is that in

16    the middle of COVID that that began?  Or is that --

17          A    COVID had kind of calmed down by then.

18    Yeah.  So that was early 2020 when the poop hit the

19    fan.  And then, yeah, we were back operating

20    electively and back in surgery centers by August of

21    2020.

22          Q    And between August 2020, if I got your

23    testimony correct, and when you prescribed and

24    performed implantation procedure -- well, scratch

25    that.  Let me lay the foundation.  Did you prescribe

Page 18

1    the Penuma device to Mr. Gonzalez?

2        A    That's a loaded question.  I did not go and

3    find any patient and prescribe this.  The patients

4    sought me out.

5        Q    Understood.  But it's a prescription-only

6    device; correct?

7        A    Yes, yes, yes.

8        Q    And you're the -- physician in this case?

9        A    Yes, we discussed it and decided that we

10   were going to do it, and yes.  Yes, I did.

11       Q    And I'm just getting a little ahead of

12   myself.  We've got to do -- lay a foundation here.

13   And so you prescribed the advice and you're the

14   surgeon who performed the implantation?

15       A    Yes.

16       Q    Okay.  And so between the time that you got

17   through with the Penuma training there in August 2020-

18   ish time frame and the time the implantation procedure

19   was performed on Mr. Gonzalez, you had done, you said,

20   about 120 to 150-ish?

21       A    That would be a good guess, yes.

22       Q    And you just said that after you do a few of

23   them you're pretty skilled at it?

24       A    Yes.

25       Q    Let's go back to Exhibit 1, if you would,

```
 1    it.  Yes.
 2        Q    Okay.  And now back to that page 6 of
 3    Exhibit 1, that next paragraph down.  So in reference
 4    to the May 19, 2022, consultation says "During this
 5    consultation with Dr. Kansas, Mr. Gonzalez filled out
 6    a questionnaire and watched a video.  Mr. Gonzalez was
 7    also informed that the implantation of the Penuma was
 8    a 'simple and reversible procedure.'
 9            "At no point did Dr. Kansas informed
10    Mr. Gonzalez that Penuma was not safe and effective or
11    not FDA cleared for cosmetic enlargement of normal
12    penises."  Just for the record, did I read that
13    correctly?
14        A    You read that correctly.
15        Q    Did you, by chance, bring a copy of the
16    video that he says that you showed him?
17        A    There is no video.  I -- I did not show any
18    type of video to any of the Penuma consults that I
19    saw.
20        Q    So on May 19, 2022, or any time thereafter,
21    you never presented Mr. Gonzalez with a video about
22    the Penuma device or the procedure?
23        A    No.
24        Q    Okay.  Here, let me show you.  I'm going to
25    give you now what I've marked as Exhibit 2 to your
```

1  deposition.  Mr. Kansas, can you identify what I've

2  marked as Exhibit 2 of your deposition?

3              (Exhibit 2 was marked for

4              identification.)

5      A    This appears to be the note from

6  Mr. Gonzalez' office visit on May 19, 2022, from my

7  electronic medical record system.

8      Q    Okay.  And as you've already stated, so this

9  is the record of his initial consultation with you?

10     A    Correct, yes.

11     Q    All right.  Right there under that, the

12 double-barred heading, there's a "CC/HPI:."  What does

13 that mean?

14     A    Chief complaint/history of present illness.

15     Q    Okay.  So this is why he came to you?

16     A    Correct, yes.

17     Q    And I guess I won't read your own record to

18 you.  Can you tell us generally why he came -- why

19 he's there?

20     A    So he came to discuss possibly having a

21 Penuma placed and also wanted me to take over the

22 management of his low testosterone.

23     Q    Okay.  So take over the management of his

24 low testosterone.  Had he been getting treated for low

25 testosterone by another physician?

Page 22

```
 1        A    No.

 2        Q    Okay.  Let's put that aside.  And we'll move

 3   on instead to Exhibit 4.

 4        A    Okay.

 5        Q    Or I'll hand it to you in a second.  Are

 6   there risks associated with receipt of the Penuma

 7   penile implant?

 8        A    Yes.

 9        Q    Prior to offering a penile or Penuma penile

10   implantation procedure to a patient, would you discuss

11   those risks with him?

12        A    Absolutely.

13        Q    So fair to say it's your custom and practice

14   to do so?

15        A    Absolutely.

16        Q    So are you -- do you recall discussing the

17   risks associated with the Penuma implantation device

18   and procedure with Mr. Gonzalez?

19        A    Yes.

20        Q    Okay.  Let me hand you what I've marked as

21   Exhibit 4.  Can you identify this document?

22                   (Exhibit 4 was marked for

23                    identification.)

24        A    Yes, this is the consent form that was

25   required for Penuma when I was doing them.  It's a
```

Page 34

1  comprehensive consent form in order to -- just in case

2  I happen to miss something in the office that I

3  discuss with the patient, they actually have it in

4  writing prior to surgery.

5       And I required that they all have a copy of

6  this before they came to the surgery center, have read

7  it, signed it, agreed with it.  If they're not

8  comfortable with it, let me know.  We don't have to do

9  this surgery.

10       With this -- with Penuma and with penile

11  implants -- and again, because I've done so many

12  penile implants, the standard things that I discuss in

13  the office are pain, bleeding, infection, retraction,

14  sensation loss, scarring, et cetera, et cetera.  This

15  is more comprehensive.

16       This is a copy of Mr. Gonzalez' consent

17  form, which he filled out about four days before his

18  surgical procedure.

19     Q    So in brief description of this document,

20  beginning on page 2, it's an eight-page document, page

21  2 of 8.  A chart is begun that runs almost to the end

22  of the document, and it's titled "Possible Risks and

23  Complications"?

24     A    Yes.

25     Q    And every entry on here, I guess, then is a

Page 35

```
1    possible risk and complication of the procedure?
2         A    Yes.
3         Q    And what is this handwritten thing I see
4    over here in this column that says "patient initials"?
5         A    Those appear to be Mr. Gonzalez' initials.
6         Q    And is the purpose of him initialing, from
7    your perspective as the physician that's given him
8    this form, to ensure that he is made aware of these
9    risks?
10        A    Aware and understands that these risks are
11   possible, yes.
12        Q    And in addition to what's in the chart,
13   there's also just a multitude of many statements here
14   that he's signing off on; is that correct?
15        A    Yes, yes.  There's -- to my -- I haven't
16   counted these in a long time, but there's about 15 or
17   18 that are listed here, and those are the ones that
18   we all as a group agreed are things that could happen
19   and that patients should be aware of before they have
20   this done.
21        Q    Now, earlier you said you recall your
22   treatment of Mr. Gonzalez.
23        A    Yeah, I remember.  I have a pretty good
24   memory, and he was a very nice guy.  He was very
25   pleasant to be around.  Yeah.
```

Page 36

1          Q     And in this lawsuit, he's alleged that he

2     suffered certain complications with the Penuma device.

3     Are you familiar with the complications that he

4     suffered?

5          A     Yes.

6          Q     Could you tell us first what those are?

7     What complications arose as a result of his receipt of

8     the Penuma device?

9          A     So what he had -- you know, so I saw him

10    back -- and I can't remember the exact timing.  We put

11    his implant in in August.  It was about two or two and

12    a half months later that I actually saw him back in

13    the clinic.  I think he had contacted me and said that

14    the base of the penis was really big, and he had

15    a -- it was -- you know, he had measured the girth at

16    something like 8 inches around or something like that.

17                And so I had a decent idea of what had gone

18    on.  And so when I saw him, he had basically what we

19    referred to as a cone defect.  And that cone defect,

20    what that's from is with -- we didn't see it that

21    often, thankfully, but what can go on is from the

22    surgery itself and/or the implant, whatever, the

23    penis -- you put the implant in, but then over time --

24    and we would do a lot of things to try to prevent

25    this, but the penis could retract.

Veritext Legal Solutions
800-336-4000

```
1    Due to the anatomical retraction of the penis

2    following implantation, the Penuma implant was pushed

3    out toward the base, and this phenomenon you refer to

4    as a cone defect?

5         A    Correct.

6         Q    Okay.  So is the complication he suffered in

7    your opinion retraction?

8         A    Correct.

9         Q    Is that something that's warned of?

10        A    Yes.

11        Q    Is that something that I could find in this

12   8-page informed consent?

13        A    Yes.

14        Q    Is that something you would have discussed

15   with him aside from the -- do you just hand him this

16   and say "here"?

17        A    No.  It's -- it's a discussion.  I will be

18   honest.  I didn't ever state all 18 of these, because

19   some of them are repetitive, but the ones that I had

20   seen and saw, those are the ones that I always went

21   over.  And again, those with Penuma, pain, bleeding,

22   infection, retraction, sensory loss, or sensory

23   decrease, scarring et cetera.

24             And in fact, I would quote about a 7 percent

25   chance of those things happening.  Any of those things
```

Page 40

1    that I would talk about, and I would say, "Hey, you're

2    going to get this consent form.  Seven percent overall

3    risk of any of these things happening."  And I would

4    also quote about a 15 percent need for a revision rate

5    over the first three to five years, again, because of

6    shifting suture issues, et cetera.

7        Q    I'm going to ask you some questions now.

8    It's going to be redundant based on what you just

9    said, but --

10       A    Sure.

11       Q    -- make sure I get the record straight.  Is

12   it correct that your testimony is, although you didn't

13   generally, it wasn't your practice to go over each of

14   these 18 items with every patient, certain things you

15   did go over with each patient, and that included

16   retraction?

17       A    Correct.

18       Q    And retraction is the issue, in your

19   opinion, that Mr. Gonzalez suffered?

20       A    Yes.

21       Q    And that was something you audibly discussed

22   with him as a possible warning?

23       A    Yes.

24       Q    Or a possible issue with the device?

25       A    Yep.

Veritext Legal Solutions
800-336-4000

1        Q    And did you say you also gave a rate of
2    potential occurrence of that retraction at 7 percent?
3        A    About 7 percent total, yes.
4        Q    And that's something you would have
5    communicated to the patient?
6        A    Yes.
7        Q    And did you also say that you discussed with
8    the patients the possibility of they might have to
9    undergo a revision surgery?
10       A    Yes.  And I told -- I told all the patients
11   that there was a need for a revision rate of about 15
12   percent over the first three to five years.  Well,
13   after three to five years, I should say.  There's --
14       Q    So at every 100 patients, that means --
15       A    About 15 -- about 7 percent.  I would tell
16   them that it's, like, 7 percent of people have a
17   significant issue, and about 15 percent of people need
18   these revised for one reason or another.  And those
19   are not huge numbers, but they exist.
20       Q    And those were risks -- and again, I know
21   this is going to be redundant of your testimony -- but
22   those are risks of which you were fully aware of at
23   the time you prescribed and at the time you offered
24   and the time you performed the implantation procedure?
25       A    Yes.

                                          Page 42

1        Q     And I know you touched on some of these

2    already, but I'm just going to go over them.   We

3    haven't had the opportunity to depose Mr. Gonzalez yet

4    and get a more definitive statement of his alleged

5    injuries.  So what I've done is I've compiled a list

6    of alleged complications or injuries that could arise

7    as set forth in his complaint.

8              And I would like to ask you about those and

9    is that -- and then with each one I'm going to ask, is

10   that something you would typically warn of, you did

11   warn of, and/or is in this informed consent form --

12       A     Okay.  Sure.

13       Q     Okay.  Abnormal, deformed looking penis?

14       A     Yes.

15       Q     That is something you would have discussed

16   with him that, hey, that might happen?

17       A     Yes.

18       Q     And is that something that is in this

19   informed consent form?

20       A     I believe so, yes.  We can look for it.  I

21   don't think the word "abnormal" is used, so I would --

22   but as a result of scarring and retraction and

23   displacement of implant, then yes, it would be

24   abnormal.

25       Q     But an abnormal deformed looking penis is

```
1    something you would have discussed with him as a
2    potential that could happen?
3         A    Again --
4         Q    But not in those exact words?
5         A    Not in those exact words.  What I just told
6    you, that is what I discussed with everyone, and then
7    the consent form.  And I don't disagree that a cone --
8    a cone, that looks abnormal.  Sure.  Absolutely.
9         Q    But that retraction and that result is
10   something you specifically discussed?
11        A    Yes.
12        Q    What about penile pain?
13        A    Again, discussed.  Yes.
14        Q    So that's something you would have discussed
15   with him prior to the procedure and it's likely in
16   this consent form as well?
17        A    Yes.
18        Q    Okay.  What about -- retraction, we
19   discussed that one so I'm going to skip over it.
20   Scarring?
21        A    Yes.
22        Q    That's a potential risk of this of --
23        A    Discussed and in consent, yes.
24        Q    Loss of sensation?
25        A    Low risk but discussed and in the consent.
```

Page 44

1        Q     Sexual dysfunction?

2        A     Low risk but discussed, and I believe in the

3   consent.

4        Q     Would that be a point of concern for many of

5   your patients?  Hey, is this thing going to

6   adversely --

7        A     A hundred -- a hundred percent.  And the

8   physiology of erectile function and how a Penuma is

9   placed, there is no physiologic reason that a Penuma

10  would cause erectile dysfunction.

11       Q     Is sexual dysfunction 100 percent synonymous

12  with erectile dysfunction?

13       A     Well, it depends on who's coming up with the

14  term.  If I talk about sexual function, it's about

15  erectile dysfunction.  But I've seen lay people call

16  sexual dysfunction -- they'll call low libido sexual

17  dysfunction, they will call delayed orgasm sexual

18  dysfunction, they will call premature ejaculation

19  sexual dysfunction.

20       Q     What would they call -- as I read the

21  complaint, I read the complaint as alleging -- and I

22  could be wrong, but if it is -- if I'm right and it

23  says loss of sensation leading to sexual dysfunctions,

24  meaning, hey, I can't feel this, and so sex isn't as

25  it should be, that would be encapsulated in, hey, loss

Page 45

1   of sensation?

2        A     Okay.  Yes.

3        Q     Right?  Would you agree?

4        A     Yes.

5        Q     How about infection?

6        A     Definitely.  Definitely discussed and in the

7   consent form.

8        Q     What about the potential need for removal of

9   the implanted device?

10        A     Discussed and definitely in the consent

11   form.

12        Q     And what about permanent shortening of the

13   penis?

14        A     Again, retraction, scarring, discussed and

15   in the consent form.

16        Q     And to beat a dead horse, and I apologize,

17   you were fully aware of all these as potential risks?

18        A     Yes.

19        Q     At the time you prescribed, at the time you

20   performed the procedure?

21        A     Yes.

22        Q     Which explains why you were in a position to

23   explain those risks to him; correct?

24        A     Correct.

25        Q     Okay.  Can I get you to flip real quick to

Page 46

1    go to that Exhibit 1, that complaint, to page 5?

2        A    Yeah.  Okay.

3        Q    Actually, no.  Scratch that.  I was in the

4    wrong spot.  No, let's go to page 5.  Okay.  I'm

5    looking at the last paragraph on that page, the first

6    sentence of it.  It states "Mr. Gonzalez also

7    reasonably believed, based on misrepresentations in

8    Defendant's advertisements, that the Penuma procedure

9    was not permanent and completely reversible and that

10   there would be no adverse consequences from the

11   removal of this device."

12            After your consultation with him concerning

13   the risk and the warning, do you think it would be

14   reasonable for Mr. Gonzalez to continue to believe

15   that there could be no adverse consequences from if

16   this device were removed or if he received it?

17       A    I made it pretty clear.  I'm not sure what

18   was in the Penuma advertisements, but I made it pretty

19   clear that if scarring occurs, infection occurs,

20   removal of device needed to occur, that it's a

21   potential disaster.

22       Q    Potential disaster?

23       A    Yeah.

24       Q    Okay.  Let me -- does everybody -- need a

25   break?  Want to keep going?  Okay.  Let me turn now to

Veritext Legal Solutions
800-336-4000

1    what I've marked as -- well, let me ask you one more

2    thing about -- is there anything you've learned since

3    performing the implantation procedure of the Penuma on

4    Mr. Gonzalez -- and I'll represent it was August 2nd

5    of 2022, that you've learned concerning additional

6    risks that you didn't know beforehand?

7            Have you learned something since then that,

8    hey, if I knew that then, I would do things

9    differently now, I wouldn't have given you the device,

10   I would have done something different?

11       A    I have not learned any -- no, I haven't

12   learned anything new.

13       Q    And I mean in terms of risks associated with

14   the device?

15       A    Yes, correct.  Yes, nothing new on the

16   risks.

17       Q    Okay.  Let me ask -- hand you now what I've

18   marked as Exhibit 5.  This is a record from Urology

19   Austin.  That's your practice; correct?

20                 (Exhibit 5 was marked for

21                  identification.)

22       A    Yes.

23       Q    Okay.  And so what are we looking at here,

24   sir?

25       A    So this is a brief op note that I like to

Page 48

1  equipment and supplies and implants and all that

2  stuff, yes.

3      Q    Dr. Kansas, is it accurate that Urology

4  Austin reimbursed Mr. Gonzalez for all monies received

5  from him in association with the Penuma implant he

6  received and then the --

7      A    That's actually not correct.  We reimbursed

8  him far more than he paid Urology Austin.

9      Q    As you sit here today, do you believe, at

10  the time you prescribed the device, do you continue to

11  believe that Mr. Gonzalez was, pursuant to the

12  standard of medical care prevailing in this community,

13  an appropriate candidate for the Penuma implant?

14      A    Yes.

15      Q    And I know we've touched on this before but

16  just allow me.  And is it true that every complication

17  that he experienced as a result of receiving the

18  Penuma implant device, was a risk known to you at the

19  time you prescribed it, and a potential risk that you

20  communicated to him to inform his decision whether or

21  not to receive the device?

22      A    Yes, either verbally or in the consent form,

23  yes.

24      Q    And retraction was in both; correct?

25      A    Yes.

Veritext Legal Solutions
800-336-4000

1        Q    And retraction is the key issue that we're
2    dealing with here?
3        A    That's the key issue, capsular retraction,
4    that's right.  Or so it -- so it seems, yes.  That is
5    my thought process as to what exactly has gone on.
6                    MR. SMITH:  Dr. Kansas, I really
7    appreciate your time today.  That's going to wrap up
8    my initial examination.  I'm going to pass the witness
9    now.  It's going to allow Mr. Gonzalez to ask you
10   questions if he has any.
11                   THE WITNESS:  Okay.
12                   MR. SMITH:  And when he's done, his
13   questions may prompt additional questions from me.
14                   THE WITNESS:  Okay.
15                   MR. SMITH:  But other than that, I'm
16   passing the witness.
17                   MR. GONZALEZ:  Can I get a five-minute
18   break here so I can go to the restroom and stretch
19   out?
20                   THE WITNESS:  How long?
21                   MR. GONZALEZ:  Five minutes?
22                   THE WITNESS:  Oh, sure.  No problem.  I
23   thought you said 20.  I was like, yeah, we need to
24   work on your prostate then.
25                   THE VIDEOGRAPHER:  The time is three

Page 87

1                        (Signature waived.)

2                        (Whereupon, at 3:09 p.m., the

3                        proceeding was concluded.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Veritext Legal Solutions
800-336-4000

```
 1              CERTIFICATE OF TRANSCRIBER
 2          I, HEAGAN JONES, do hereby certify that this
 3   transcript was prepared from the digital audio
 4   recording of the foregoing proceeding, that said
 5   transcript is a true and accurate record of the
 6   proceedings to the best of my knowledge, skills, and
 7   ability; that I am neither counsel for, related to,
 8   nor employed by any of the parties to the action in
 9   which this was taken; and, further, that I am not a
10   relative or employee of any counsel or attorney
11   employed by the parties hereto, nor financially or
12   otherwise interested in the outcome of this action.
13   January 6, 2026
14

15                           HEAGAN JONES
16
17
18
19
20
21
22
23
24
25
```

                                             Page 92