# EXHIBIT B

```
1              UNITED STATES DISTRICT COURT

2               WESTERN DISTRICT OF TEXAS

3    _____

4    JOSE M. GONZALEZ,

5            Plaintiff,

6        v.                         Case No.

7    INTERNATIONAL MEDICAL DEVICES,     1:24-cv-00982-DAE

8    INC. Et Al.,

9            Defendant.

10   _____

11        VIDEOTAPED DEPOSITION OF JOSE M. GONZALEZ

12   DATE:          Wednesday, January 7, 2026

13   TIME:          3:00 p.m.

14   LOCATION:      Remote Proceeding

15                  Statesville, NC 28625

16   OFFICIATED BY: William De Bolt

17   JOB NO.:       7815633

18

19

20

21

22

23

24

25
```

Page 1

```
1                    - shall constitute written stipulation
2                       of such.
3                    At this time, will everyone in
4     attendance please identify yourselves for the record?
5                    MR. SMITH:  Jonathan Smith, counsel for
6     Defendants.
7                    MR. HENNINGER:  Stephen Henninger,
8     counsel for Defendants James Elist MD, a medical
9     corporation, and Dr. James Elist.  And Rene Garces,
10    who's a law clerk with my law office.
11                   THE OFFICER:  Thank you.  Hearing no
12    objection, I will now swear in the witness.
13                   Mr. Gonzalez, will you please raise
14    your right hand?
15    WHEREUPON,
16                       JOSE GONZALEZ,
17    called as a witness and having been first duly sworn
18    to tell the truth, the whole truth, and nothing but
19    the truth, was examined and testified as follows:
20                   THE OFFICER:  Thank you.
21                   Counsel, you may proceed.
22                       EXAMINATION
23    BY MR. SMITH:
24       Q    Good afternoon, Mr. Gonzalez.  I know we've
25    met before, but for the sake of the record, would you
```

                                                    Page 6

1      A    There's three claims against the defendants.

2      Q    Okay.  So we got the FDA clearance related

3  claim, the medical risk associated with the device

4  claim.  What is the third one?  Well, let me ask you

5  this, Mr. Gonzalez, can I find all your complaints in

6  your complaint that you filed with the court?

7      A    I'm sorry?

8      Q    You have an amended complaint filed in court

9  right now?

10     A    I have an amended complaint filed in court,

11  yes.

12     Q    Are all your claims against my clients for

13  wrongdoing, are they in that complaint?

14     A    Yes.

15     Q    Okay.  That'll be good.  Let's move on from

16  there.  Okay.  With respect to that FDA clearance type

17  claim, am I correct that your claim is that the

18  defendants led you to believe that the device was

19  cleared by the FDA for cosmetic augmentation of the

20  penis for aesthetic purposes, when it was only cleared

21  for cosmetic correction of soft tissue deformities?

22     A    Yes.

23     Q    Okay.  I'm going to show you now,

24  Mr. Gonzalez, what I've marked as Exhibit 1 to your

25  deposition.

Page 22

```
 1                  (Exhibit 1 was marked for
 2                  identification.)
 3            Can you let me know if you see it?  Can you
 4      see Exhibit 1, Mr. Gonzalez?
 5            A    I'm seeing it.
 6            Q    All right.  Do you recognize this as an
 7      affidavit you filed in this lawsuit?
 8            A    Yes, I do recognize that as an affidavit I
 9      filed in this lawsuit.
10            Q    Okay.  I want to go through some of these
11      things with you.  And so you know what I'm doing, I'm
12      trying to build a timeline of the events that
13      transpired before you had the implantation procedure.
14            A    Okay.
15            Q    And we'll get to a little bit more later,
16      but you underwent the procedure to implant the Penuma
17      penile implant on August 2, 2022.  Is that correct?
18            A    Correct.  Yes.
19            Q    And from here on out, if I refer to the
20      Penuma penile implant that you received on August 2,
21      2022 as the device, will you understand what I mean?
22            A    Yes, I understand what you're saying.
23            Q    Okay.  Okay.  So I'm looking now at Exhibit
24      1, paragraph 1B, do you see where I'm at?
25            A    Yep.
```

Page 23

```
1    says you received an email from a person named Zack
2    who introduced himself as an employee with Dr. Elist?
3         A    Yeah, a male enhancement consultant.
4         Q    A male enhancement consultant?
5         A    Yes.
6         Q    Okay.  Let's go to, and then you've got a
7    slide here.  I'm going to show you now what I've
8    marked as Exhibit 2 to your exhibit [sic].
9                   (Exhibit 2 was marked for
10                   identification.)
11              Well, before I do that, you see here at the
12   end of paragraph 1C, you cited to docket number 28-2?
13        A    Yes,
14        Q    That's what I've marked as Exhibit 2.  Can
15   you confirm that that's accurate?  That this is what
16   you referred to as docket number 28-2?
17        A    Yes.
18        Q    Page 3.  So here is page 3 of docket filing
19   28-2.  And is this the email you referred to that you
20   got from Zack, the male enhancement consultant?
21        A    I believe it is.
22        Q    Okay.  Can you confirm there's nothing in
23   this from --
24        A    Yeah, that's the email.
25        Q    Okay.  Can you confirm whether or not
```

Page 27

1    there's any representations in this email concerning

2    the nature of the FDA clearance for the device?

3        A    No, I do not see none.

4        Q    When you read, in 2016 in that GQ article, I

5    believe you said that it said something about the

6    device having been cleared by FDA.  Was that important

7    to you?

8        A    It's approved by the government.  I mean, if

9    it's -- if the government said it's clear, then it's

10   clear.  There was no reason for me to doubt the

11   government.

12       Q    Okay.  Well, thanks.  All right.  Let's see.

13   Let's go now to this paragraph 2A.  It says, "Over the

14   years I kept researching different penile enhancement

15   options."  What other options did you research?

16       A    Injectables, there was -- there was several

17   other devices that -- that were on the market, but

18   they all seemed risky and I would go back to listen to

19   what IMD had to say about other devices.  So I would

20   research it because, unfortunately, at the time I

21   didn't have the money together to get the device put

22   in at that time.  So I had to save up to get the

23   procedure done.

24            But if I had the money then, I would've had

25   it done within -- by -- by my birthday in 20 -- 2017.

                                              Page 28

1  offered on the market that were not FDA cleared?

2      A   They were not FDA cleared.  No.  And they

3  were not -- they were done -- they were being done by

4  plastic surgeons, but they were not being done by

5  urologists.

6      Q   And how did you determine whether or not

7  those devices were FDA cleared?

8      A   It didn't say anything about FDA anything.

9      Q   Okay.  So you assumed because it didn't say

10  anything about it being FDA cleared, those other

11  devices weren't FDA cleared?

12      A   Correct.  They were probably doing it in

13  somebody's garage.

14      Q   Okay.  Continuing here on your affidavit

15  Exhibit 1, it says in February 2022, you found a video

16  of Dr. Elist giving a talk called "The History of

17  Penile Enlargement and the Advent of the Penuma."  You

18  watched it multiple times because he has a thick

19  accent.  You had YouTube's automatic captions produce

20  a written version of what he was saying.  Is that

21  right?

22      A   Yes.

23      Q   Okay.  So the statements in paragraph 2A are

24  are accurate?  You stand by that testimony today?

25      A   Yes, that's pretty accurate.  Yeah, I

1    was -- I was sold that day after I seen the -- the

2    video.

3         Q    So this video was an important part in your

4    determination to go get the Penuma?

5         A    Yes.  I -- I watched the doctor, the

6    inventor himself, give a speech to other urologists at

7    a ground round video.  And I was -- I was a believer.

8    I didn't have no reason to doubt Dr. Elist.

9         Q    A couple questions on that.  Earlier you

10   said that had you had the money in 2017, you'd had the

11   procedure done then; correct?

12        A    Yes.  Yes.

13        Q    So by the time you got to the 2022 video,

14   were you not already sold, as you said, on the Penuma?

15        A    I was sold, but the only thing that changed

16   was he was doing it through the scrotum and not

17   through the upper half of the penis.

18        Q    What do you mean?  That's a change from

19   what?  What do you mean?

20        A    Because before he would cut in top of

21   your -- where -- where your pubic and your -- your

22   penis meet up, he would cut there and he would slide

23   it in through, you know, the glove in the penis that

24   way.  But in 2022 he changed it.  He did it through

25   the scrotum and that it wouldn't show no scar on the

Page 31

1    penis.  So nobody can tell that you had it.

2        Q    And that was a good development as you saw

3    it there?

4        A    That was a phenomenal development.

5        Q    Okay.  Also, you -- I'm sorry.

6        A    No scar on the penis.

7        Q    No, I understand.  And you say this YouTube

8    video, he was giving a talk.  You said he was giving

9    the talk to, the audience was urologists?  I'm sorry.

10        A    The doctors, yes.

11        Q    So the audience of the video was urologists?

12        A    Correct.  Yes, but I -- I --

13        Q    And you understood.

14        A    I believe that was --

15            THE OFFICER:  Mr. Gonzalez, can you

16    please remember to -- to speak one at a time?  Wait

17    for Mr. Smith to finish.

18            THE WITNESS:  I'm sorry.  I'm sorry,

19    Mr. Smith.

20            THE OFFICER:  Thank you.

21    BY MR. SMITH:

22        Q    Oh, no problem.  So but at the time in 2022

23    you understood that he was talking to other

24    urologists?

25        A    Yes.

Veritext Legal Solutions
800-336-4000

1        Q    And you're not a urologist; correct?

2        A    I am not.

3        Q    I'm going to show you what I have marked as

4   Exhibit 3 to your deposition.  Please let me know if

5   and when you can see it.

6                (Exhibit 3 was marked for

7                identification.)

8        A    Yep, I see it.

9        Q    Okay.  Do you recognize this as a document

10  you filed with the court titled Motion to Admit

11  YouTube Transcript into Evidence?

12       A    Yes.

13       Q    Okay.  And is the transcript that you're

14  seeking to have admitted into evidence with this

15  motion, the transcript of the YouTube video we've been

16  discussing?

17       A    Yes.  That's the video.

18       Q    So this is it?

19       A    Yes, that's it.

20       Q    And in your opinion, is this transcript an

21  accurate restatement of what was said during the

22  YouTube video?

23       A    Yes.  I've also subpoenaed Grand Rounds, so

24  they have submitted the original.

25       Q    The original what?

Veritext Legal Solutions
800-336-4000

1        Q    And you said you read this transcript

2    multiple times or you saw the video multiple times.

3    Correct?

4        A    Yeah, but I didn't understand what he meant

5    by soft tissue deformity because he didn't specify

6    that.

7        Q    And perhaps --

8        A    Go ahead.

9        Q    And again, he was speaking to an audience of

10    urologists, which you're not.  Correct?

11        A    Correct.

12        Q    Okay.  Earlier we were discussing your claim

13    and you agreed that, as stated in your complaint, that

14    you felt deceived because you said before you had the

15    implantation done, you were led to believe that the

16    FDA cleared the device for cosmetic augmentation, but

17    it was only cleared for cosmetic correction of soft

18    tissue deformities.  You remember that?

19        A    That's -- that's correct, Smith.  But if I'd

20    had soft tissue deformity, then that should have been

21    something that was addressed, which I didn't.  And me,

22    not having soft tissue deformity should have

23    disqualified me automatically.  They should have said,

24    you know what, you don't qualify for this procedure

25    because you don't have soft tissue deformity.

Page 42

1          And that was never told to me when I went to
2     the -- either when I sent the -- the questionnaires
3     back to IMD and they approved the surgery for me to go
4     see Kansas.  Nobody told me that I, you know,
5     that -- that I did not qualify because I didn't have
6     soft tissue deformity.  And when I seen Kansas, he
7     didn't say, "Well, you know what, this doesn't apply
8     to you because you do not have soft tissue deformity."
9          Nobody at no time told me that I was not a
10    candidate for the Penuma device.  From -- from when I
11    first reached out to them in 2016 to 2022, nobody ever
12    said, "You know what, Mr. Gonzalez, you do not qualify
13    for this because you do not have soft tissue
14    deformity." They kept that information.
15    And -- because if I didn't understand what that meant,
16    then they should have clarified it for me, and nobody
17    did.
18          And that's why I'm here today.  And that's
19    why I'm sitting here in front of you, Smith, telling
20    you that nobody sat down with me to tell me anything
21    about that.  As doctors, as they were urologists,
22    professionals that I believed in a hundred percent
23    blindly, I gave them, you know, my divided intention
24    to -- to believe whatever they were saying.
25          And if I -- if I was not a candidate, they

Page 43

1    should have said, "You know what, Mr. Gonzalez, you do

2    not qualify for this.  You must leave and not come

3    back here until you start to experience some type of

4    soft tissue deformity."  Today, as I sit here, I do

5    have soft tissue deformity, and today I am a

6    candidate, which is unfortunate for me because I have

7    been in -- in the -- in the dark the whole time.

8          You know, as men -- as we all are men here

9    sitting today, we all have an intimate life with our

10   penis.  And I have been estranged from my penis for

11   the last three years.  As a man, we understand what

12   I'm saying.  I cannot finalize what I need to

13   finalize, and I am stressed out about that.  And I'm

14   sitting here today asking for justice.

15          As men we see what happens and we can't

16   ignore that.  They never told me that I didn't have

17   soft tissue deformity.

18      Q    Okay.  Thank you.  And I'm going to

19   respectfully -- or are you still going?

20      A    No, no, I'm sorry.

21      Q    Respectfully, I'm going to move to strike

22   your answer as nonresponsive.  That just means I'm

23   getting it on the record.  Actually, scratch that.  I

24   remove that motion to strike.  In that answer you just

25   gave, you said that, am I right, you're upset it

Page 44

```
1    sounded like because these doctors, including

2    Dr. Kansas didn't tell you that you were --

3         A    Should have disqualified me from being a

4    candidate.

5         Q    Let me finish.  Okay.  So you're saying they

6    should have disqualified you as a candidate and they

7    didn't.  And you think that was wrong?

8         A    Yes.  I -- I truly, hardly believe that was

9    wrong.  I was --

10        Q    And you believe it is --

11        A    -- one thing, and -- and at the end of it, I

12   wasn't suffering from soft tissue deformity.

13        Q    And do you believe that these doctors who do

14   this for a living, trained in it, et cetera, they

15   should be the ones to determine whether or not you're

16   eligible for the procedure?  It shouldn't be left up

17   to you?

18        A    They said that I was eligible, and that's

19   why I went to see Dr. Kansas.

20        Q    And would you agree that it is the

21   physician's role to determine whether or not the

22   patient is eligible for a given procedure?

23        A    IMD determined that.

24        Q    IMD determined it?

25        A    Dr. Kansas -- IMD determined that because
```

Page 45

1    and -- and that's why we're here.

2         Q    Okay.  I have gone through your affidavit

3    through section three here that's labeled

4    misrepresentation of FDA clearance.  And I believe

5    we've looked at every document cited in it, et cetera.

6    And we have not seen anywhere where a representation

7    was made that the device was cleared for cosmetic

8    enhancement.  And what I'm asking you now is can you

9    point to any advertisement or other thing that shows

10   that yes, before you received the device, someone told

11   you it was FDA cleared for cosmetic enhancement of the

12   penis for penile enlargement or whatever.

13        A    I don't have it in front of me, Smith.  I

14   can't give you that right now.

15        Q    Do you have it somewhere else?

16        A    I would have to go home in front of the

17   computer and log in and look for it.  Right now

18   I'm -- I'm on the road.

19        Q    Well, I understand.  Earlier though, I asked

20   you if you had any advertisements concerning the

21   Penuma, et cetera, other than what's been produced in

22   the -- I'm going to restart that question.  Let me

23   finish it.  I know it's frustrating.  I know this is a

24   personal issue for you and it's unfortunate, but we're

25   just trying to get through it here.

Veritext Legal Solutions
800-336-4000

```
 1              Earlier in this, I asked you, hey, other
 2      than what you produced or filed or otherwise come out
 3      in the litigation, do you have any advertisements
 4      considering the Penuma, you know, from the relevant
 5      time period, meaning the period before you received
 6      the device or you got it, and you said, no, it was all
 7      produced or in this action.  Is that a true statement?
 8         A    I -- I've given you everything I have.
 9         Q    Okay.  It says also here on paragraph 3A of
10      that affidavit, which is Exhibit 1 of this deposition
11      that through marketing materials and conversations
12      with defendant, so on and so forth, do you remember
13      talking on the phone to anybody and them saying, "Hey,
14      let me tell you about the FDA clearance.  We got this
15      thing cleared for healthy penises or for penis
16      enlargement?"
17         A    No, Smith, nobody ever reached out to me
18      about that.
19         Q    Okay.  So that wasn't part of any
20      conversation.
21         A    I -- I've never had a conversation about
22      healthy penises or Penuma or anything like that on the
23      phone
24         Q    Or the nature of the FDA clearance?
25         A    No.
```

Page 52

1       Q    Is there anything that you brought with you

2   today that you prepared for the purpose of this

3   deposition?  I mean I wrote this, I created this

4   document for this deposition.

5       A    I -- I mean the papers that I've sent to you

6   is the papers that I got here that I -- I filed to the

7   courts, but since I forgot my reading glasses too, I'm

8   kind of --

9       Q    Thank you.  Okay.  Okay.  And just to wrap

10  up this FDA bit, as you sit here today, is it true

11  that you have no recollection of anyone telling you

12  audibly before you received the device that, "Hey,

13  this device is FDA cleared for cosmetic augmentation

14  or penile enlargement"?

15      A    No, everything I've seen was either through

16  the websites, through the YouTube channels, that's it.

17  And the magazines that I've read.

18      Q    Okay.  Is it consistent with your testimony

19  to say that no one ever discussed or told him what the

20  FDA clearances were, you just knew it was FDA cleared

21  and you assumed therefore that it was FDA cleared for

22  whatever the doctors decided to do with you with it?

23      A    That it was cleared for everybody.

24      Q    Okay.  But there was never a, I'm interested

25  in the nature of the FDA clearance of this and they're

Page 54

1    telling me it's A, when it's really B, that kind of

2    thing wasn't in your head?

3        A    No.

4        Q    You're just in retrospect saying, :Hey, this

5    thing didn't work out for me.  I thought the thing was

6    FDA cleared."  And then you looked into it and said,

7    "Wait a minute, this clearance doesn't seem to apply

8    to me."

9        A    No.

10       Q    Okay.

11       A    Because, Smith, if they're the gatekeepers

12   and I'm filling out a form and I am presenting it to

13   the manufacturer, and they're aware that I don't have

14   no soft tissue deformity and it's not on their website

15   saying that specifically, then how do I know what it

16   is?  If they're not telling me, "Hey, you're not

17   qualified for this because you don't have soft tissue

18   deformity."

19       Q    Okay.  So am I correct in saying that it's

20   your position that by providing the device to you,

21   that act was tantamount to representing to you that,

22   hey, it's FDA cleared for you?

23       A    I believe that was the -- the moment that

24   they said that it was for me, but there was no --

25       Q    Right.  And so am I right in saying, because

Page 55

```
 1      I'm trying to understand because I've been reading
 2      your complaint.  I've been looking at this case for a
 3      while and it seemed like to me you were saying, hey,
 4      y'all were telling me it was FDA cleared for men like
 5      me who had healthy penises, just wanted to be larger,
 6      when in fact it was wasn't, it was cleared for this.
 7      And had you told me the truth, I wouldn't have moved
 8      forward.
 9           A    Correct.
10           Q    That's how I was determining it up till now.
11      But after talking to you today, am I right in saying
12      it's more --
13           A    No, you were right what you said.
14           Q    Okay.  Okay then.  Can you point me to any
15      evidence to support the claim that a defendant or
16      someone on Defendant's behalf told you this device is
17      FDA cleared for use in healthy penises as a cosmetic
18      enhancement?
19           A    Nobody told me that.  Just what I saw --
20           Q    Okay.  And can you point to any
21      advertisement that said, "Hey, this device has been
22      cleared by FDA for the cosmetic enhancement of healthy
23      penises"?
24           A    The GQ magazine.
25           Q    The GQ magazine said that?
```

Page 56

1      A     Yeah.

2      Q     Because earlier I thought you said the GQ

3  magazine just said it was FDA cleared.

4      A     Cleared.  But, you know, it -- it gives you

5  a -- a story of what it's -- what's the purpose of it,

6  to enlarge men's penises.  It wasn't specific about if

7  it had soft tissue deformity or not in that magazine.

8  It didn't speak about that.

9      Q     One way or the other, just it was cleared?

10      A     It was cleared.

11      Q     Let me ask you here on paragraph 3A of this

12  affidavit that was marked as Exhibit 1, you said

13  Defendants either knowingly misrepresented this fact

14  or failed to correct it, misleading me, et cetera.

15  Why do you think they knew they had misled you, they

16  had knowledge of having done it?

17      A     Because they're doctors.

18      Q     Okay.

19      A     They're a professional in their fields

20      Q     And therefore they should have known that

21  you misunderstood the nature of the FDA clearance?

22      A     They should have known that I didn't have

23  soft tissue deformity or placed it in the

24  questionnaires.  If they would've been straight with

25  me and they would've done in the questionnaire asking

Page 57

1      Q    Do you also think that, hey, Dr. Kansas, a

2   licensed medical professional should have said, "Wait

3   a minute, sorry IMD sent you over here, but you don't

4   qualify for this"?

5      A    He's an employee of IMD.  He was contracted

6   with IMD, so he's doing what's best interest for IMD.

7      Q    Okay.  Moving on.  I'm just moving on with

8   the affidavit here, it says failure-to-warn claim.  It

9   says here, I'm in section 4A.  Oh man, I'm sorry, I'm

10  not sharing this.  Can you see it?

11     A    Yes.

12     Q    Okay.  We're still on Exhibit A, I mean, I'm

13  sorry, Exhibit 1, that affidavit of yours.

14     A    Affidavit?

15     Q    Yes, sir.  Exhibit 1 to your deposition is

16  this affidavit we identified earlier.

17     A    Yes.

18     Q    Okay.  And I'm just walking through it and

19  I'm moving down to paragraph 4 or section 4, paragraph

20  A.  And so you know, kind of a segue in the

21  deposition, I'm going to temporarily move away from

22  the FDA thing and go into the warnings about the

23  device.  Follow me?

24     A    Yep.

25     Q    Okay.  So section 4 of your affidavit here

Page 59

1    says, "Failure-to-warn claim" is the heading of the

2    section.  And then paragraph A under there says, "I

3    was never properly warned about the risks associated

4    with the Penuma implant, including scarring,

5    retraction, loss of sensation, and high chance of

6    deformity."  Is that your testimony here today, that

7    you weren't properly warned about those things?

8         A    That's correct.

9         Q    Is scarring, retraction, loss of sensation

10   and deformity, are those things that you experienced?

11        A    I am.

12        Q    And continue to experience.  Now, real

13   quick, we'll come back to this, but down if I skip

14   down to section 5 of this affidavit, injury and

15   damages, paragraph B, I have the same list except it

16   includes swelling.

17        A    Yep.

18        Q    Okay.  So swelling, retraction, loss of

19   sensation, and deformity.  Are those the risks that

20   you are claiming you weren't adequately warned of?

21        A    Correct, because they said that if I had any

22   complications, that it would always be reversible and

23   it could be removed and that I would go back to the

24   way I was originally prior to surgery.

25        Q    What I'm asking are, did you have any other

Page 60

```
 1    complications from the implantation procedure other
 2    than what you've listed here?  Swelling, retraction,
 3    loss of sensation, deformity --
 4         A    Yeah, deformity.
 5         Q    And swelling.
 6         A    Yeah.
 7         Q    Is that a complete list of the risks that
 8    you claim you should have been warned of?
 9         A    Yeah, that it was permanent.  They should
10    have told me that it was a permanent -- that it
11    wouldn't be retracted or it couldn't be restored back
12    to the way it was originally.  They downplayed that.
13         Q    Are you saying that --
14         A    If they would have told me --
15         Q    Are you saying that someone told you this is
16    a risk-free procedure?  If it goes wrong, we can just
17    just remove and everything would be like normal?
18         A    According to Dr. Elist in his -- his own
19    video, he says that it's a minimal and it can be
20    reversible.  Can be reversed back to the way it was.
21         Q    That video where he was speaking to
22    urologists?
23         A    Yes.
24         Q    Do you think that the chance that an
25    audience of urologists when they hear, "Hey, this is a
```

Page 61

1    retraction, flaring with a thick base."  Is what he's

2    writing there, does that comport with your memory?  Is

3    that --

4         A    I -- I was still numb.  I guess I still

5    didn't have an erection.  It -- it looked the way it

6    was after surgery because it was still nonresponsive.

7    And then I experienced my first erection, which was

8    the most painful thing I've ever experienced in my

9    life.  I -- I mean, I was -- I was on the -- I was in

10   agonizing pain for a good couple of hours.

11        Q    Okay.  And your issues, when you're not in

12   an erect state is it fine?

13        A    No.  It's -- it's -- no, when I'm not in my

14   erect state, it's -- it's bothering me.  So it -- it

15   bothers me.  It's -- it's a constant pressure on my

16   bladder.

17        Q    Okay.  Now I want to get back to the issue

18   of you having been warned.  What do you feel they

19   should have told you?

20        A    That I didn't qualify for the surgery.

21        Q    With respect to the risks associated with

22   the surgery if you got it?

23        A    That it was permanent.  That it was not

24   reversible.

25        Q    Let's go back to Exhibit 3.

Page 78

1        A    That the percentage of failing was high --

2                THE OFFICER:  I didn't get that last

3    part.  Can you repeat the end of your answer?

4        A    That the rate of failure was higher than

5    what they alleged.

6        Q    What is the rate of failure?

7        A    15 percent.

8        Q    What is it?

9        A    15 percent.

10       Q    Are you saying one five or five zero?

11       A    One five.

12       Q    So 15 percent is the rate of failure.  And

13   what did they tell you the rate of failure was going

14   into this?

15       A    Less than 7 percent.

16       Q    And if they'd have said, hey, at that time

17   the failure rate is 15 percent instead of 7 percent,

18   would you have elected to have the surgery?

19       A    No.  And if they would've told me that it

20   was permanent, I would've told them no.  If they

21   would've told me that I had to pay for surgery again,

22   I would've told them no.

23       Q    Okay.  So if they'd have told you that the

24   complication rate was at 15 percent instead of 7

25   percent, you would've declined the surgery?

Page 79

1    mean, I'll represent to you at his deposition, he

2    testified that, hey, prior to the implantation, I told

3    Mr. Gonzalez, hey, there's a, I remember 7 percent

4    chance of retraction, et cetera, just what's written

5    here.  And I'm asking you, did he do that?  Did he

6    tell you there was a 7 to 10 percent complication

7    rate?

8         A    I don't recall what he said.  All I know is

9    that I did sign the document.

10        Q    Okay.  Well, let's look at that document.

11   Let's go to what I've marked as -- well, first, let's

12   go to what I've marked as Exhibit 6.

13                  (Exhibit 6 was marked for

14                  identification.)

15              This is a medical record that Dr. Kansas

16   testified is a record of your first consultation with

17   him on May 19, 2022.  And I was just going to ask you

18   to confirm, do you agree that May 19, 2022 was the

19   first time you met Dr. Kansas?

20        A    I believe that was.

21        Q    Okay.  And then at that visit, according to

22   this record, you were there for a Penuma consult.

23   That you went there for the purpose of, hey, doctor,

24   let's talk about this Penuma?

25        A    To get the implant.

Page 85

1      Q    Right.  Okay.  All right.  Now let's go to

2  what I've marked as Exhibit 7.  Do you recognize this?

3              (Exhibit 7 was marked for

4              identification.)

5      A    The before and after treatment, or what I

6  need?

7      Q    Let me zoom in a little bit.  It says here

8  at the top, "Consent for elective penile enhancement

9  surgery."

10     A    Yep.

11     Q    And I'll represent to you that Dr. Kansas

12  says that you signed this and this is where you're

13  saying, hey, I understand all these risks.  Do you

14  remember doing that?

15     A    Yep.

16     Q    Can you confirm, is this your signature or

17  your initials or whatever in these boxes?

18     A    Yes.

19     Q    And on this page?

20     A    Yes.

21     Q    And on this page?

22     A    Yes.

23     Q    And on this page?

24     A    Yes.

25     Q    And on this page?

Veritext Legal Solutions
800-336-4000

1      A    Yes.

2      Q    This page?

3      A    Yes.

4      Q    And on this one?

5      A    Yep.

6      Q    Okay.  So all these signatures on this

7  informed consent are yours.  Let's look at this one.

8  You signed next to this one, it says penile

9  retraction; correct?

10      A    Yep.

11      Q    Okay.  So would you agree you were warned of

12  the chance of retraction?

13      A    Possibility.  It was a possibility of it

14  being retracted.

15      Q    Right.  Well, I didn't mark all these, so we

16  won't go through them, but you'll agree that you read

17  this form before you signed it?

18      A    Yeah, I was told that it was a possibility

19  the things that can happen, but that I needed to sign

20  if I wanted to get the procedure done.

21      Q    Right.  And here's one, here's a chance of

22  penile deformity here too.  You signed next to that

23  one; correct?

24      A    Yep.

25      Q    And here, lack of sensation was a risk that

Page 87

1    you signed about right there; correct?

2         A    Correct.  It also says possible risk and

3    complications.  Possible.

4         Q    Right.  So you knew that this could possibly

5    happen?

6         A    It could happen, but he said that it very

7    rarely happens.

8         Q    Seven to 10 percent of the time, he says in

9    that letter; correct?

10        A    True.  But I also thought that he did 1,200

11   surgeries, which in -- in fact, at the deposition I

12   think he said he only did what, 200?  Or less than 200

13   or something like that.

14        Q    Again, you're not allowed to ask me

15   questions.  Sorry.  Or rather, I'm not required to

16   answer them, I guess.  Here's a risk of penile implant

17   misalignment.  You're aware of that risk; right?

18        A    Possible, yeah.  Possible risk.

19        Q    And here's a risk of swelling.  So you knew

20   that was a risk; correct?

21        A    Yeah, possible swelling.

22        Q    Are you still experiencing swelling?

23        A    I experience swelling and discomfort.

24        Q    And here we have in bold your acknowledgment

25   that there's no warranty or guarantee has been made to

Veritext Legal Solutions
800-336-4000

```
 1    you as to the result of the procedure; correct?
 2         A    Yep.
 3         Q    And what do you understand that to mean when
 4    you signed it?
 5         A    That Kansas didn't guarantee his work.
 6         Q    Would that include the outcome?
 7         A    That would include the outcome or the
 8    product itself.  But I thought the product did have a
 9    warranty, a lifetime warranty.  But maybe I'm wrong
10    about that.
11         Q    Dr. Kansas testified that he did, he told
12    you there were certain things you were to refrain
13    from, like for example, no sex, other things for
14    certain amounts of times.  Did you comply with all
15    those orders?
16         A    To the letter.
17         Q    Okay.  We saw that your first visit with
18    Dr. Kansas was on May 19, 2022; correct?
19         A    I believe it was.
20         Q    And now we're going to go back, I want you
21    to look at what I've marked as Exhibit 5 to your
22    deposition.  I'm going to call it the FDA clearance
23    history for the Penuma device that you created.  You
24    created this chart; correct?
25         A    I created that chart, yes.
```

Page 89

```
1    ten -- the ten day fine?
2                    THE WITNESS:  No, ten days is fine.
3                    THE OFFICER:  Mr. Henninger?
4                    MR. HENNINGER:  Yes?
5                    THE OFFICER:  Would you like to order a
6    transcript?
7                    MR. HENNINGER:  Yeah, same as John.
8                    THE OFFICER:  Thank you.
9                    THE VIDEOGRAPHER:  Okay.  We are off
10   the record at 5:41.
11                   (Signature waived.)
12                   (Whereupon, at 5:41 p.m., the
13                    proceeding was concluded.)
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 96

```
 1              CERTIFICATE OF DEPOSITION OFFICER
 2              I, WILLIAM DE BOLT, the officer before whom
 3      the foregoing proceedings were taken, do hereby
 4      certify that any witness(es) in the foregoing
 5      proceedings, prior to testifying, were duly sworn;
 6      that the proceedings were recorded by me and
 7      thereafter reduced to typewriting by a qualified
 8      transcriptionist; that said digital audio recording of
 9      said proceedings are a true and accurate record to the
10      best of my knowledge, skills, and ability; that I am
11      neither counsel for, related to, nor employed by any
12      of the parties to the action in which this was taken;
13      and, further, that I am not a relative or employee of
14      any counsel or attorney employed by the parties
15      hereto, nor financially or otherwise interested in the
16      outcome of this action.

17                              WILLIAM DE BOLT
18                              Notary Public in and for the
19                              State of Texas
20
21
22
23
24
25

                                     Page 97
```

1         CERTIFICATE OF TRANSCRIBER

2         I, EVELYN BURTNETT, do hereby certify that

3    this transcript was prepared from the digital audio

4    recording of the foregoing proceeding, that said

5    transcript is a true and accurate record of the

6    proceedings to the best of my knowledge, skills, and

7    ability; that I am neither counsel for, related to,

8    nor employed by any of the parties to the action in

9    which this was taken; and, further, that I am not a

10   relative or employee of any counsel or attorney

11   employed by the parties hereto, nor financially or

12   otherwise interested in the outcome of this action.

13

14                        *Evelyn Burtnett*

15                                        EVELYN BURTNETT

16

17

18

19

20

21

22

23

24

25

                                              Page 98